**WILLIAMSON–DICKIE MFG. CO., Plaintiff-Appellant-Cross Appellee,**

v.

**HORTEX, INC. and the B. F. Goodrich Company, Defendants-Appellees-Cross Appellants.**

**No. 73–3740.**

United States Court of Appeals, Fifth Circuit.

Dec. 3, 1974.

Rehearing Denied Jan. 7, 1975.

---

Joseph A. DeGrandi, Richard G. Young, Washington, D. C., Wyndham K. White, El Paso, Tex., for plaintiff-appellant-cross appellee.

John A. Grambling, El Paso, Tex., for Goodrich Co.

Joe W. Christie, El Paso, Tex., for Hortex, Inc.

R. W. Furlong, Boston, Mass., James R. Lindsay, Akron, Ohio, for defendants-appellees-cross appellants.

Before TUTTLE, THORNBERRY and SIMPSON, Circuit Judges.

THORNBERRY, Circuit Judge:

In 1967, B. F. Goodrich Company began to manufacture a plastic reinforcement film for commercial sale to garment manufacturers. Hortex, Inc., a Texas garment producer, purchased the Goodrich product, called Fabrilock,[1] and used it to reinforce the knee areas of boys' trousers. Williamson-Dickie Mfg. Co. is the owner of the Mizell patent[2]

---

1. Goodrich has actually produced three types of Fabrilock film. They originally manufactured Fabrilock Red, a plastic film with a backing of release paper to keep the film from sticking to itself. Fabrilock Red was never distributed on a large scale basis as Fabrilock Blue quickly replaced it. Fabrilock Blue added a water soluble release coating between the film and the paper. Then in 1971 Goodrich marketed Fuzzy Fabrilock,

which used a permanent backing of non-woven fabric to avoid the excessive reduction in tear strength experienced with Fabrilock Red and Fabrilock Blue. Hortex never used Fabrilock Red, but did use the other two products. Williamson-Dickie claims that all three infringe upon the Mizell patent.

2. United States Patent No. 3,089,806, issued May 14, 1963. The patent is named after

that related to a method of reinforcing garments by applying heat and pressure to a film of thermoplastic material. They sued Goodrich and Hortex for patent law violations. Williamson-Dickie claimed that Hortex's use of Fabrilock film infringed upon the Mizell patent,[3] and that Goodrich's actions in marketing Fabrilock constituted contributory infringement.[4]

█ Goodrich and Hortex denied infringement of the Mizell patent, and counterclaimed for a declaratory judgment of invalidity and an award of attorneys' fees. Adopting almost all of the defendants' proposed findings of facts and conclusion of law, the district court ruled that Hortex and Goodrich had not infringed upon the patent, and that the patent itself was invalid.[5] Williamson-Dickie appeals the trial court's decision on those issues, while Goodrich and Hortex cross appeal the denial of attorneys' fees. We affirm the district court's ruling on the validity issue; accordingly we do not reach the infringement claim. We also affirm the district court's refusal to award attorneys' fees.

### The Mizell Patent

On May 13, 1959, Louis R. Mizell applied to the Patent Office for a patent on an invention relating to producing garments with increased resistance to abrasive wear.[6] His original application made sixteen claims relative to both the process and the end product. Protracted negotiations between Mizell's attorneys and the Patent Examiner followed. The Examiner rejected all the original claims and seven subsequent claims. On May 14, 1963, he finally allowed the following claim:

A method of making a garment comprising, cutting pieces of fabric of about 10 ounce weight to peripheral dimensions and shapes for fabrication into a garment, overlaying said pieces in areas of potential wear with a film of thermoplastic material having a thickness of approximately 2 mils, and simultaneously applying heat from about 345° F. to 440° F. and pressure from about 14 p. s. i. to 145 p. s. i. for periods of about 3–10 seconds to cause the film to flow around the fibers of the fabric in said area on one side only and separate at the interstices between the fibers to render said area permeable to air and water and prevent mechanical separation of the thermoplastic material from the fabric.

---

Louis R. Mizell, the researcher who conducted the tests that ultimately led to the patent grant.

3. In violation of 35 U.S.C. § 271(a), which provides: "Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent."

4. In violation of 35 U.S.C. § 271(b), (c), which provide:
  "(b) Whoever actively induces infringement of a patent shall be liable as an infringer."
  "(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."

5. The trial judge adopted all of defendants' proposed findings of fact and conclusions of law save the conclusion that this case was "exceptional" within the meaning of 35 U.S. C. § 285 so as to justify an award of attorneys' fees. This practice is not viewed with favor in this circuit. However, it does not alter the scope of our review in this case. See Ag Pro, Inc. v. Sakraida, 5th Cir. 1973, 474 F.2d 167, 171.

6. Mr. Mizell worked for Harris Research Laboratories, a Washington, D. C. consulting firm that Williamson-Dickie hired to solve their knee patch problems. At the time Mizell began his work, Williamson-Dickie used the Hood patch, a rubber patch that produced satisfactory abrasion resistance and tear strength. But excessive wear occurred around the edges of the patch because of its thickness. Mizell sought to solve the wear problem, yet maintain satisfactory tear strength and abrasion resistance.

Thus the end product under the Mizell process has the following characteristics: (1) flow of the film on only one side of the fabric; (2) separation of the film at the interstices rendering the area permeable to air and water; (3) a permanent bond between film and fabric. Mizell's process achieves these results through application of heat and pressure to the film and fabric for a certain time period.

The striking characteristic of the Mizell patent is the breadth of the claim. When Mizell's deposition testimony is considered in conjunction with the language of the claim, its scope becomes clearer. The patent is not limited to certain types of fabrics. Nor does it embrace a limited class of thermoplastic materials.[7] Instead the claim refers to any fabric "of about 10 ounce weight," and to any thermoplastic film "having a thickness of approximately 2 mils." Yet Mizell's deposition testimony makes clear that the 10 ounce weight is not crucial. He testified that Williamson-Dickie manufactured work clothes with fabrics ranging from 5 to 12 ounces in weight, and that wear problems were similar for all of them.[8] He later referred to the problem of strikethrough —having the film penetrate through both sides of the fabric:

> Q Did you ever observe a problem of strikethrough in connection with the film patches which you subsequently developed for Williamson-Dickie?
>
> A Yes.
>
> Q And in what connection did you observe the problem in that case?
>
> A When we got the pressure or thickness too great we could get strikethrough.
>
> Q Did it depend also on the weight of the fabric?
>
> A We could get strikethrough with twelve-ounce denim.

> Q Would it stike through twelve-ounce denim just as readily as through a five-ounce fabric?
>
> A Under different pressure and temperature conditions.[9]

The proper temperature factor depended in large part on the heat softening temperature of the particular thermoplastic film employed. Mizell testified that he used a temperature of about 440° to cause caplene (a Nylon film) to fuse and imbed into the fabric, while 325–350° was sufficient to achieve that result with polypropylene.[10] Mizell stated the basic requirement as follows:

> Q Continuing at the bottom of page 10, the entry says that the propylene film was placed on the fabric and pressed in the Carver press at 345 degrees, the conditions otherwise apparently being the same as for the Mylar film and the caplene film.
>
> How was the temperature of 345 degrees Fahrenheit selected for this first experiment?
>
> A Well, if you look on page 9 you will see that the polypropylene, it says the heat sealing range is 325 to 350 so we are close to the 350.
>
> Q It was considered important then to have the temperature within the heat softening range of the material in question?
>
> A Well, it was important to have to get the temperature of the film in the heat softening range, . . . .[11]

Mizell's testimony shows that the patent claim does not contain precise specifications for a particular film and fabric. He stated that ". . . these factors are interrelated . . . by applying more pressure for a longer time we could have been a little lower in the temperature . . . ."[12] The figures in the claim represent the range of temperatures, pressures and times that Mizell used in his experiments. Given the interrelationship between the five varia-

---

7. A thermoplastic material is any material that has the characteristic of softening under application of heat, then regaining its original texture when cooled.

8. App. at 679.

9. *Id.* at 681.

10. *Id.* at 686–88.

11. *Id.* at 689.

12. *Id.* at 687.

bles—time, temperature, pressure, fabric thickness, and film thickness–the particular specifications in his process are achieved through trial and error. We find that the district court properly concluded Mizell's process was obvious in light of the prior art.

### Validity of the Mizell Patent

■ The three basic tests for patent validity are utility, novelty, and nonobviousness. 35 U.S.C. §§ 101, 102, 103. When a patent application survives the scrutiny of the Patent Office, it presumptively passes all three tests, and the burden of establishing invalidity rests with the party challenging the patent. 35 U.S.C. § 284. But the presumption of validity weakens when the challenger presents evidence of prior art not considered by the Patent Office. Beckman Instruments, Inc. v. Chemtronics, Inc., 5th Cir. 1970, 439 F.2d 1369, 1374–1375. Here Goodrich and Hortex contend that the Mizell patent was obvious in light of certain prior art not disclosed to or considered by the Patent Office.

■ The Supreme Court has set out the applicable boundaries of the obviousness inquiry in Graham v. John Deere Co., 1966, 383 U.S. 1, 86 S.Ct. 684, 15 L. Ed.2d 545. Mr. Justice Clark stated:

> While the ultimate question of patent validity is one of law, Great A. & P. Tea Co. v. Supermarket Equipment Corp., supra, 340 U.S. 147 at 155, 71 S.Ct. 127 at 131 [95 L.Ed. 162 (1950)], the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

Id. at 17–18, 86 S.Ct. at 694, 15 L.Ed.2d at 556. The standard of invention under the patent laws is a demanding one. Lear, Inc. v. Adkins, 1969, 395 U.S. 653, 676, 89 S.Ct. 1902, 1914, 23 L.Ed.2d 610, 626. The Supreme Court has counselled that strict observance of the Graham three-pronged test for obviousness is required since the patent standard is bottomed on the Constitution. Anderson's–Black Rock, Inc. v. Pavement Salvage Co., 1969, 396 U.S. 57, 61–62, 90 S.Ct. 305, 308, 24 L.Ed.2d 258, 262.

### A. Scope and Content of the Prior Art

In Finding of Fact No. 42, the district court defined the scope of the prior art. "A man of ordinary skill in the art would have been familiar with the properties and characteristics of thermoplastic materials and of fabrics at the time the alleged invention of the patent was made." We agree. Mizell's claim is not limited to a particular type of fabric or thermoplastic film.

The district court also found that a person of ordinary skill in the art would have been familiar with all the patents cited by Goodrich and Hortex as more relevant to the Mizell claim than the references the Examiner relied upon.[13] Wil-

---

13. Goodrich and Hortex cited the following references:

(1) Anderson Patent, No. 1,930,030, issued October 10, 1973. Patent on a reinforce member for stockings. The Anderson patent described use of heat and pressure to permanently secure a patch of gutta-percha (a natural thermoplastic material) to the stocking. (App. 796).

(2) Wann Patent, No. 2,138,588, issued November 29, 1938. Patent on the product resulting from impregnation of fabric with liquid thermoplastic material. The proper amount of material is determined through "cut and try" experimentation. (App. 800).

(3) Redman Patent, No. 2,283,698, issued May 19, 1942. Redman's patent covered lamination of fabrics through the use of a

liamson-Dickie does not contest the finding that these patents were within the scope and content of the prior art. Rather they argue that these patents are no more relevant to the Mizell patent than the references cited and ultimately rejected by the Examiner. In fact they imply that the Patent Examiner may have considered these patents.

## B. Relationship Between the Mizell Patent and the Prior Art

■ We find no significant differences between the results achieved through the Mizell process and those achieved by the prior art references cited by Goodrich and Hortex. The Anderson, Redman, Kline, and Gillespie patents all teach application of heat and pressure to cause thermoplastic material to flow around the fibers of the fabric, effecting a substantially permanent bond.[14] Both Kline and Gillespie explicitly teach flow of the film on one side of the fabric only.[15] Redman and Gillespie claim that permeability results from their processes.[16]

None of the references cited by Goodrich and Hortex give the same ranges of temperature, pressure, and time as appear in the Mizell claim. However, given the interrelationship between those factors, we find that the lack of precise specifications is immaterial. The general principle, as stated in Mizell's deposition testimony, is that the temperature, pressure, and time must be sufficient to cause the thermoplastic material to soften and imbed itself into the fabric. Yet the temperature cannot be so high as to scorch the fabric.[17] Both Redman and Kline explicitly refer to this principle.[18]

Robert F. Johnson, the expert witness for the defendants below, testified that the Mizell process would have been obvious to one of ordinary skill in the art prior to the filing date of the Mizell patent. The district court accepted that statement in Conclusion of Law Number 9. We believe the record amply supports the district judge's conclusion. Mizell's original application sought to patent the resulting article of manufacture as well as the process itself. The Patent Examiner consistently rejected the product claims, and eventually allowed the process claim. But the actual method for achieving Mizell's results would have been obvious to one of ordinary skill in the art.[19]

### Attorneys' Fees

■ Under 35 U.S.C. § 285, the court has discretion to award attorneys' fees to the prevailing party in exceptional cases. In this case, the district court

---

thermoplastic adhesive film. The claim describes the use of heat and pressure to secure a permanent bond, and leave the material permeable to laundering fluids. (App. 802).

(4) Kline Patent, No. 2,631,947, issued March 17, 1953. This patent related to heat-sealing adhesive tapes to mend household goods. The process created a permanent bond between the thermoplastic film and the fabric. Heat was applied to bring the thermoplastic sheet to the softening point for sufficient time to achieve flow on one side of the fabric only. (App. 805).

(5) Gillespie Patent, No. 2,646,374, issued July 21, 1953. Patent on semi-stiff articles of apparel such as collars, cuffs, and shirt bosoms. Gillespie's invention teaches bonding of the thermoplastic sheet to the fabric through the application of heat and pressure. The patent teaches avoidance of strikethrough and notes that the finished product is permeable. (App. 810).

(6) Manwaring Patent, No. 2,757, 266, issued July 31, 1956. Patent on the press often used to apply the requisite heat and pressure to the patch. (App. 814).

14. Anderson at col. 3, lines 4–22 (App. 798); Redman at col. 1, lines 3–18, col. 3, lines 3–11 (App. 803); Kline at col. 2, lines 2–6, col. 4, lines 1–11 (App. 805, 806); Gillespie at col. 2, lines 21–26 (App. 810).

15. Kline at col. 2, lines 2–6 (App. 805); Gillespie at col. 2, lines 26–30 (App. 810).

16. Redman at col. 6, lines 13–16 (App. 804); Gillespie at col. 2, lines 16–20 (App. 810).

17. App. 701–02.

18. Redman at col. 6, lines 5–13 (App. 804); Kline at col. 1, lines 51–57, col. 2, lines 1–2 (App. 805).

19. The district court also held the patent invalid for failure to distinguish from the prior art under 35 U.S.C. § 102. Conclusion of Law No. 8. Because we hold the patent invalid under 35 U.S.C. § 103, we do not review the trial court's conclusion on anticipation.

refused to hold that this was an exceptional case within § 285, and did not award attorneys' fees. We, as an appellate court, cannot lightly overturn that decision. "The law placing, as it does, the discretion in the trial court to determine . . . whether the case is an exceptional one so that attorneys' fees should be allowed, appellate courts ought not to and will not interfere with the exercise of such discretion. Indeed, they may not do so unless there is such a clear abuse as to show that discretion was not exercised, or unless it is plain that the trial court's decision is based on an erroneous concept of law." Graham v. Jeoffroy Mfg., 5th Cir. 1958, 253 F.2d 72, 78 (Tuttle J.).

It is our conclusion that the district court did not abuse its discretion in refusing to award attorneys' fees. Our review of the record provides no indication that Williamson-Dickie has not proceeded in good faith in this litigation, or in its dealings with the Patent Office. Under these circumstances, the trial court properly refused to award attorneys' fees. Garrett Corp. v. American Flight Systems, Inc., 5th Cir. 1974, 502 F.2d 9.

Affirmed.