John L. HART, Plaintiff,

v.

L. A. BAARCKE et al., Defendants.

No. 74–715–Civ–NCR.

United States District Court, S. D. Florida, Miami Division.

April 26, 1975.

John H. Oltman, William J. Flynn, of Oltman & Flynn, Ft. Lauderdale, Fla., for plaintiff.

Vincent L. Barker, Jr., Allen Owen and Mark C. Schaffer, of Owen & Owen Co., L.P.A., Toledo, Ohio, Joseph P. Metzger, of Walton, Lantaff, Schroeder, Carson & Wahl, West Palm Beach, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW FINDINGS OF FACT

ROETTGER, District Judge.

Plaintiff brought suit for infringement of patent after purchasing a woman's swimsuit, with a brand name of "Belgrad" from defendants L. A. Baarcke d/b/a North Palm Beach Swim Shop on May 24, 1974.

Plaintiff was a swim official and amateur coach and developed the suit for his daughter Maureen while living in Iowa Falls, Iowa. He began to feel the necessity of developing a suit for women's competitive swimming about 1958 and kept working on the design until he felt it had reached a successful stage in 1962. The high neck design attempted to obviate the sea anchor effect of sagging swimsuits at the top; it also moved the straps closer to the neck in order to achieve ease of movement of the shoulders. The application was filed June 3, 1963 and was issued as patent 3,183,524 on May 18, 1965.

Plaintiff formed a corporation, Hart Suit, Inc., an Iowa corporation, and is President of it. It is the only licensee of the patent and he operates out of the family home and garage in Fort Lauderdale, Florida. Plaintiff was running ads for the suit as early as 1964 and there was some early and continued acceptance of the suit.

Patti Coretta, now Mrs. Thompson, testified that she wore the Hart suit at the Nationals in 1965 at Toledo, as did the other members of the 800 meter relay team which set a world's record; she also wore it in the 1966 Nationals in which she set a world's record in 1500 meter free-style. The testified that the design of the suit met with scorn and scoffing when she first wore it at the Nationals; this indicates to the court that the design was novel and startling to the persons at the National A.A.U. Tournament in 1965. Inasmuch as the witnesses (nearly all of them swimming coaches) all seem to know each other, evidently through frequent confrontations at various meets and national and world competition, the court must conclude that the design of the suit was novel when it first appeared in tournaments about 1965. This is further corroborated by the comments of one of defendants' witnesses, June Krauser, when she first saw the suit in Fort Lauderdale.

In court plaintiff's daughter, Maureen, modeled the Hart suit and the claimed infringing swimsuit, the "Belgrad", which allegedly has a U.S. patent in behalf of its owner Busing & Company of West Germany, and is imported by

Rothhamer, Inc. of California. The suits are virtually indistinguishable in design above the waist. Below the waist the "Belgrad" suit lacks the "skirt" across the front which had been required under the National A.A.U. standards of this country up until 1973. The need for the skirt (quarter panel) was eliminated by the A.A.U. Rules Committee after the women's swim team of East Germany soundly trounced the U.S. swimmers and other swimmers in the World Competition at Belgrade, Yugoslavia in 1973 wearing the "Belgrad" suit which featured a lycra fabric as well as the absence of the skirt panel.

The court finds the Hart suit design and the design of the "Belgrad" suit virtually indistinguishable from the waist up, and that the "Belgrad" suit infringes the patent of the plaintiff, John L. Hart, assuming that the patent is valid.

The court makes a specific finding that part of the success of the "Belgrad" suit, perhaps much of its success, is the use of the lycra material which is described by various witnesses as "like swimming with no clothes on." In fact, the suit is referred to by the swimmers as the "skin suit." However, the court finds that the material has been used in other suits, namely, "Ceebee" but the material alone did not make it a successful item in the world of competitive swimmers.

The court must observe at this point that the Hart swimsuit involved was designed for competitive swimmers in an effort to decrease the times of the swimmers wearing the suit. The suit was not designed for the average woman wishing to look her best—or for recreational use in swimming pools and at beaches. The court can observe that its design would result in an unacceptable pattern of tanning.

Defendant contends that the patent is invalid as obvious to a person of ordinary skill in the art, because all elements of the patent were disclosed by a combination of prior art publications.

Defendant introduced a German catalog of Lehmacher & Co. of Hamburg, Germany which contains (Defendant's Exhibit 12) a swimsuit model 3054 which model is demonstrated in a photograph. The photograph only shows the back of the suit as well as the armpit design under one shoulder. Among the description, in German, of this sales catalog of a Sears-Roebuck type, is one adjective claiming that the suit is "drag-resistant" and "enhances the start of the race."

The court finds that the design on the back is almost identical with the photographs submitted by the plaintiff to the United States Patent Office on June 12, 1963, contained in the file wrapper, which is identified as "a rear view of applicant's suit."

The other prior art claimed by defendant is contained in the Tuesday, July 2, 1957 edition of "The Sydney Morning Herald," published in Sydney, Australia. In that edition are photographs of Australian swim stars Dawn Fraser and Lorraine Crapp and the caption under one of the photographs indicates that "the new costumes feature high necklines to prevent drag from water getting inside them . . ." The backs of the swimsuits are not visible but the front bears a strong resemblance to the front upper design of plaintiff's patent.

The witnesses of defendant testified that it would have been obvious to them to come up with the design incorporated in plaintiff's patent if they had the picture before them of the German design for the upper back of the swimsuit (apparently first introduced in 1952) and the upper front design of Miss Crapp's suit (Miss Crapp is designated in the newspaper as the designer of the suit.)

The question presented then is whether the photograph in the 1957 German publication of one element of plaintiff's design, coupled with the photograph, and caption, of the upper front design of a woman's swimsuit, as featured in a daily edition of a 1957 Australian newspaper, constitutes important prior contribu-

tions to the art enabling anyone skilled in the art to re-create the design.

■ When a patent survives the scrutiny of the patent office it presumptively has passed the three tests of patent validity: utility, novelty and nonobviousness. *Williamson-Dickie v. Hortex,* 504 F.2d 983 (5th Cir. 1974). Of course this presumption is somewhat weakened, if not destroyed, if the Patent Examiner failed to consider what has been alternatively termed "important contributions to the art," *Cornell v. Adams,* 258 F.2d 874 (5th Cir. 1958), better prior art, *Ingersoll-Rand Co. v. Brunner & Lay,* 474 F.2d 491 (5th Cir. 1973), or more pertinent prior art. *Garrett Corp. v. American Safety Flight Systems,* 502 F.2d 9 (5th Cir. 1974).

■ Ordinarily the types of prior art considered as important contributions or better prior art which will weaken the presumption of validity are noncited United States or foreign patents in conjunction with publications. See *Williamson-Dickie v. Hortex, supra* (6 United States patents not cited); *Garrett Corp. v. American Safety Flight Systems, supra* (7 United States patents and 1 foreign patent); *Cornell v. Adams, supra* (6 important patents and several publications). However, in *Rosaire v. Baroid Sales Division,* 218 F.2d 72 (5th Cir. 1955) the court relied on one foreign publication which anticipated the patent in suit to invalidate the patent.

■■ The key is not the quantity of the prior art but the quality of its teachings. One foreign publication, no matter how obscure, may be sufficient to invalidate a patent claim if it clearly and definitely discloses the elements of the patent in suit. As was stated in *Application of Moreton,* 288 F.2d 708, 48 CCPA 875 (1961) the patent statute does not discriminate on the basis of the nationality of the prior art reference; the standard of clarity and definiteness applies to any reference, whether foreign or domestic, which is being considered as prior art.

■ If the prior publication describes the invention in such full, clear and exact terms so as to enable a person skilled in the art to practice the invention without assistance from the patent under attack then the patent fails for lack of novelty under § 102. See *Bros. v. W. E. Grace Mfg.,* 351 F.2d 208 (5th Cir. 1968).

■■ The court is not faced with an anticipation defense under § 102, but with a challenge to the inventiveness of the patent under § 103, which is described as a less stringent standard than the requirement of substantial identity within the four corners of a single reference necessary to find anticipation. See *Popeil Bros. v. Schick Electric,* 494 F.2d 162 (7th Cir. 1974). All claims of the patent need not appear in full, clear and exact terms in a single prior art reference; it is possible to extract teachings from various pieces of prior art as long as each reference relied upon clearly discloses the specific element of the claim and the idea of combining the elements flow logically from the teachings of the prior art. See *Zero Manufacturing v. Miss. Milk,* 358 F.2d 853 (5th Cir. 1966).

■ Although obviousness is a legal determination, it is bottomed on a threefold factual test as set forth in the landmark case of *Graham v. John Deere,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The court must determine the scope and content of the prior art, ascertain the differences between the prior art and the claimed invention and measure these differences by the level of ordinary skill possessed by a person in the pertinent art. *Id.* at 17, 86 S.Ct. 684. Relevant subconsiderations include commercial success, long felt but unresolved needs and the failure of others. *Id.* The test enunciated in *Graham* is described as a demanding standard of invention. *Lear v. Adkins,* 395 U.S. 653, 676, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). Strict observance to the requirement enunciated in *Graham* is necessary. *Anderson's Black Rock v. Pave-*

*ment Co.,* 396 U.S. 57, 62, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969). "He who seeks to build a better mousetrap today has a long path to tread before reaching the Patent Office." *Graham v. John Deere, supra,* 383 U.S. at 19, 86 S.Ct. at 695.

Plaintiff does not dispute that isolated elements of his claim were disclosed by the prior art; nevertheless, he claims that his combination of the various elements cooperated in a unique manner to achieve a result which is superior to the results previously achieved. He relies on the principle of synergism. See e. g., *Garrett Corp. v. American Flight Systems, supra,* 502 F.2d at 20; *Hadco Products v. Walter Kidde,* 462 F.2d 1265, 1269–70 (3rd Cir. 1972); *Cornell v. Adams, supra.* Justice Jackson in *Great A. & P. Tea Co. v. Supermarket Equipment,* 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950), cautioned courts to scrutinize combination patent claims "with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements," and to avoid giving effect to a patent which is merely a combination of old elements which unites the elements without changing their function.

The subject matter of the patent in suit is a design for a woman's swimsuit which tends to reduce drag and suit discomforts, enabling a swimmer to go faster with less effort. The patented suit is conventional below the waist; above the waist the suit is characterized by three major elements which constitute plaintiff's two claims: (1) a high and close-fitting front and back panel, (2) straps positioned inwardly from the shoulder lying close to the neck, and (3). armholes cut out extending downwardly from the straps substantially below the armpits so that the entire shoulder blade area, back muscles and armpit area is bare.

The purpose of the high or close-fitting front and back panels, described in the patent specification, is to prevent drag or billowing; that is, to prevent the gulping of water between the suit and the back or breast of the swimmer. The resistance caused by water entering the front or back, occurring primarily on turns and starts is described as the "sea anchor" effect.

The purpose of placing the straps close to the neck is to reduce forces on the shoulders of the swimmer when she is swimming. An early advertisement for plaintiff's suit compares the pressure forces when the strap is placed well out on the shoulders as opposed to the minimal resistance when the strap is placed close to the neck. The close-in straps are also designed to minimize stretching of the suit and chafing as well as to prevent the straps from slipping off the shoulders of the swimmer.

The purpose of the low-cut armholes in conjunction with the strap construction is to leave bare a relatively large area of the shoulders and back of the swimmer in order to free the important shoulder and back muscles: the trapezius muscles, the infraspinatus muscles, the teres major muscles and the deltoid muscles.

The scope of the prior art must be limited to designs for women's bathing suits above the waist. The content of the prior art is not extensive. The most common design for women's conventional racing suits at the time of plaintiff's application for his patent, and earlier, is shown by two bathing suits introduced by plaintiff and by plaintiff's own advertisements and brochures. These suits disclose a relatively low-cut front and back with shoulder straps positioned far out on the shoulders. The conventional suit covers most of the major back and shoulder muscles. There does not seem to be any dispute that prior to 1965 when plaintiff began to market the girl's swimming suit embodying the invention, women competitive swimmers generally wore the type of suit described to the court as the conventional suit. In fact, when swimmers began wearing the Hart suit they encountered ridicule and skepticism which is a hallmark of invention. See *United*

*States v. Adams*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). There is also no dispute that the design of the patent in suit has been widely accepted as is evident by a perusal of the May and June, 1974 issues of *Swimming World*, Plaintiff's Exhibit 18. The fact that the design is still considered innovative is apparent from an article describing various reasons for the success of the Belgrad suit which appeared in *Todays Daily Telegraph Magazine* of London on February 13, 1975:

> The new cut reaches up to the neck, in front as well as in back, to eliminate "drag" or slowdown from the water that had always been scooped up by the old lower necklines. Larger armholes give more freedom for shoulder movements and the straps are so short, they could never slip off again.

However, no matter how much skepticism an invention is met with and no matter how much acclaim it eventually receives as an innovation, if the elements comprising the invention are disclosed by an examination of the prior art, it is irrelevant that no one previously availed himself of the knowledge. *Graham v. John Deere, supra*. It is also irrelevant that the inventor himself created the design without the aid of prior art references. *Garrett v. American Flight Systems, supra*.

The fact that counsel for defendant discovered the obscure prior art references upon which defendant relies for its defense of obviousness is a tribute to the "antlike persistence" of patent lawyers. *Bros. v. W. E. Grace Mfg., supra*, 351 F.2d at 209. The prior art references dug up by defendant are 1956 and 1957 German advertising brochures and pictures with captions describing swimming suits in two 1957 Australian newspapers.

The court must infer that the Patent Examiner never had these pieces of art before him and these prior art references to women's competitive swimming suits are certainly more pertinent than the several U.S. patents to which the Patent Examiner referred which primarily disclose recreational bathing suits from the early 1930's.[1] Their teachings can have but minimal relevance to a modern-day designer seeking to enhance comfort and speed in women's competitive swimsuits. Nevertheless, even with the cited prior art, which the court can only describe as being as irrelevant and remote from plaintiff's patent in suit as the Jantzen swimsuit modeled by Dick Powell and relied upon by defendant as prior art, the Patent Examiner twice rejected the claims of the Hart patent as being substantially met by a combination of the previously-cited patents.

1. The U.S. Gassel patent of 1932, which the Examiner cited for its high neck or front discloses a recreational bathing suit designed to provide a suit which "may be worn continuously for a long period of time and yet accommodate itself to natural requirements such as the excretional processes [and nursing purposes] without the necessity of complete removal." The patent concerns itself solely with methods of inconspicuously placing zippers and interlocking fasteners in the crotch and breast areas. The U.S. Anderson patent of 1910 which is also cited for its high neck and front concerns itself entirely with the design of a man's swimsuit below the waist. The 1934 U.S. Crego patent which is cited for its close-in shoulder straps is a man's athletic suit designed to cover the male's essential parts and to prevent undue movement of the covered parts. The Block 1931 French patent, also cited as showing close-in shoulder straps, discloses a design for a recreational bathing suit designed to prevent straps from slipping off the shoulder by the use of a criss-cross pattern. The 1930 Cowdrey patent which is cited to demonstrate a patent disclosing unrestricted arm movement bears no resemblance to the design principles of the Hart suit, although it does address itself to the problem of comfort and minimizing interference with the movements of the swimmer. Lastly, the 1932 Rothblum patent cited to show deep arm holes discloses a woman's recreational bathing suit designed so that it may be "conveniently converted to either expose substantially the entire back of the wearer to the invigorating and health imparting action of the sun's rays or to maintain the back of the wearer covered up for comfort, warmth and protection."

The court concludes that the German advertising brochures disclosing women's competitive swimsuits and the Australian newspaper photos and captions showing women competitive swimmers in a swimsuit designed by Lorraine Crapp are more pertinent than the prior art considered by the Patent Examiner. It would take a stroke of creative genius to create the Hart patent from the assemblage of the six patents cited by the Patent Examiner; however, the court finds that, although useful and innovative in design, the elements of the Hart patent are clearly disclosed by combining the German and Australian prior art publications.[2]

The photos and captions describing the swimsuits designed by Lorraine Crapp disclose high necklines and specifically state that the purpose of the "high necklines is to prevent drag from water getting inside them." This statement describes "sea anchor" effect and the same method of solving the problem as proposed in the Hart patent claims. There is virtually no difference between the prior art reference and the high and close-fitting neck of the Hart patent. The same function is performed by having a high and close-fitting neck in the Hart patent as in the Crapp suit: the elimination of drag.

The photographs in the German advertising brochures disclose the back of a woman's swimsuit which can only be described as virtually identical to the back of the Hart suit in every essential detail. The straps extend over the shoulders close to the neck with low cut armholes extending downwardly from the straps substantially below the armpits so that the entire shoulder blade area of the wearer is bare. Although the photograph and caption do not describe the reasons for the back constructions, anyone skilled in the art would have been well-acquainted with the problems of women's conventional swimsuits

listed in Hart's patent application, such as sea anchor effect, strap resistance and lack of freedom of the major back muscles. Consequently, the reasons for the back construction would have been obvious to them.

Since all elements of the Hart patent are disclosed by two prior art references, the only question remaining is whether it would have been obvious to one skilled in the art of competitive swimsuits to combine the high and close-fitting front of the 1957 Crapp suit with the back of the Lehmacher German swimsuit. The Hart patent is not a mechanized or highly technical patent. Specific and detailed instructions are unnecessary to copy the design. Defendant's witnesses testified that it would have been obvious to them. The court concludes that a combination of these two prior art references to one skilled in the art would have been obvious. These two prior art references teach each and every element of the claims of plaintiff's patent.

Although the Hart suit may be the most efficient combination of elements for the design of a woman's competitive swimsuit, the court cannot conclude that Hart's combination of elements resulted in a synergistic effect as the term has been employed. *Cornell v. Adams, supra.* Each element of the patent is disclosed by the prior art and each element performs the same function when aggregated. The idea of combining these elements logically flows from the teachings of the prior art and from a knowledge of the problems caused by low-cut fronts and straps positioned out from the shoulders. *Zero Manufacturing v. Miss. Milk, supra.* The mere fact that new and even unexpected advantages result from the aggregation is insufficient to support a claim of synergism. *Id.*

Notwithstanding the fact that Hart was years ahead of his American compa-

---

2. The parties have stipulated that the German brochures and Australian newspaper photos and captions are printed publications which were distributed to the public. Thus their status as prior art publications under § 102 has not been contested.

triot swimsuit designers and that his self-designed suit was greeted with derision and then acceptance, the specific elements of his design claims were disclosed by suits designed by Lorraine Crapp and by a suit marketed by Lehmacher & Co. of Germany.

■ The court must conclude as a matter of law, that based on the prior art as disclosed by the German and Australian publications, the design of the Hart suit would have been obvious to a person having ordinary skill in the art of swimsuit design and the patent is therefore invalid and unenforceable.

■ An award of attorney's fees would be improper as this is not an "exceptional case" within the meaning of 35 U.S.C. § 285. Plaintiff at all times proceeded in good faith in this litigation and in his dealings with the Patent Office. *Keystone Plastics v. C & P Plastics*, 506 F.2d 960 (5th Cir. 1975); *Williamson-Dickie Mfg. Co. v. Hortex, supra.*