**Ty S. DOUGLAS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–8997.**

Court of Appeals of Alaska.

Aug. 31, 2007.

**27.** *Id.*

David D. Reineke, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Tamara E. de Lucia, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

In June 2002, Ty S. Douglas committed two assaults (on separate days) against his girlfriend, K.I. On both occasions, Douglas brutally beat K.I. and sexually penetrated her without her consent. Based on this conduct, Douglas was convicted of two counts of first-degree sexual assault, as well as two counts of fourth-degree assault. This Court affirmed Douglas's convictions. *See Douglas v. State*, 151 P.3d 495 (Alaska App.2006).

While Douglas was in jail awaiting trial on those charges, he spoke to K.I. dozens of times by telephone—even though he had been ordered to have no contact with her. In these telephone conversations, Douglas repeatedly attempted to persuade K.I. to give testimony that would exculpate him. Based on this conduct, Douglas was convicted of both witness tampering, AS 11.56.540(a)(1), and first-degree unlawful contact, AS 11.56.750(a)(2). He now appeals these convictions.

Douglas's trial on the witness tampering and unlawful contact charges was unusual in that the trial judge, Superior Court Judge Michael A. Thompson, barred Douglas from the courtroom. Douglas listened to the proceedings by telephone from another location. The outgoing voice signal on this telephone was muted, so that no one in the courtroom would be able to hear anything that Douglas said.

Toward the end of the trial, Douglas stated that he wished to testify, and he asked permission to return to the courtroom to deliver his testimony. Judge Thompson was willing to let Douglas testify by telephone, but he refused to allow Douglas to present

his testimony in the courtroom. Douglas now appeals that ruling, arguing that Judge Thompson's refusal to let him return to the courtroom to deliver his testimony violated his right to due process of law under the federal Constitution.

But as we explain below, Douglas's behavior at several pre-trial court proceedings was so intemperate, disruptive, and uncontrolled that Judge Thompson could justifiably conclude that it would be impossible to conduct orderly proceedings if Douglas was in the courtroom. We therefore reject Douglas's argument that this procedure violated his right to due process.

Douglas also argues that Judge Thompson should not have allowed the State to introduce evidence that Douglas had already been convicted of the two sexual assaults on K.I. But one of the defense attorney's strategies at trial was to suggest that Douglas had never sexually assaulted K.I.—and thus, to the extent that Douglas might have urged K.I. to give exculpatory testimony, he was only asking her to tell the truth.

Given this defense strategy, the fact that Douglas was convicted of the two sexual assaults became relevant to the jury's resolution of the witness tampering charge, and Judge Thompson could reasonably conclude that the probative force of this evidence outweighed its potential for unfair prejudice. Because of this, and because Douglas raised no other objection to this evidence, we affirm Judge Thompson's decision to allow the State to introduce this evidence.

Finally, Douglas argues that Judge Thompson should have removed Douglas's defense attorney from the case after Douglas physically assaulted this attorney during an attorney-client conference at the jail. But the attorney declared that he was willing to continue to represent Douglas even after this assault, and (as we explain in more detail below) we conclude that the situation did not require the attorney's disqualification.

*Judge Thompson's decision to bar Douglas from the courtroom during his testimony*

■ One of the key features of our criminal law is a defendant's right to attend their trial. This right to be present during the trial proceedings stems from a defendant's right of confrontation and the defendant's right to receive due process of law—rights guaranteed by both the federal and the Alaska constitutions.[1]

■ Nevertheless, the United States Supreme Court held in *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), that defendants can lose the right to be present if they engage in disruptive behavior that makes it impossible to hold an orderly trial. The Supreme Court declared that trial judges must be empowered to deal with a defendant who manifests "flagrant disregard in the courtroom [for] elementary standards of proper conduct". *Id.*, 397 U.S. at 343, 90 S.Ct. at 1061. Thus, "a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Id.*, 397 U.S. at 343, 90 S.Ct. at 1060–61.

As this Court explained in *Rae v. State*, 884 P.2d 163 (Alaska App.1994), the *Allen* decision suggests three alternative methods of dealing with disruptive defendants: using the court's contempt power to coerce the defendant into behaving; ordering the defendant's removal from the courtroom until the defendant agrees to behave; or binding and gagging the obstreperous defendant so that no further disruption is possible. However, *Rae* holds that binding and gagging is a disfavored procedure in Alaska: a trial judge

---

**1.** See *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970); *Snyder v. Massachusetts*, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934); *Diaz v. United States*, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912); *Wamser v. State*, 652 P.2d 98, 101 n. 10 (Alaska 1982); *Dixon v. State*, 605 P.2d 882, 884 (Alaska 1980); *State v. Hannagan*, 559 P.2d 1059, 1063 (Alaska 1977); *Noffke v. State*, 422 P.2d 102, 104 (Alaska 1967); *Crouse v. Anchorage*, 79 P.3d 660, 664 (Alaska App.2003); *Henry v. State*, 861 P.2d 582, 592 (Alaska App.1993). See also Alaska Criminal Rule 38(a), which declares that "[t]he defendant shall be present ... at every stage of the trial".

can resort to this method only after a hearing, and only after affirmatively finding that lesser measures will be ineffective. *Id.* at 165–66.

In the present case, in a series of pre-trial hearings, Douglas repeatedly engaged in disorderly, disruptive, and disrespectful behavior toward the judge, the prosecutor, and the defense attorney. As explained in more detail below, Douglas received repeated warnings to control his behavior. And, despite these warnings, Douglas proved unwilling or unable to control his outbursts.

In the end, Judge Thompson ruled that Douglas had forfeited his right to attend the trial. The judge ordered corrections officers to hold Douglas in a room on another floor of the courthouse when the trial was in session. From this room, Douglas could listen to the proceedings but could not be seen or heard himself.

Douglas does not challenge Judge Thompson's initial decision to exclude him from the trial. However, toward the end of the trial, Douglas announced that he wished to testify in his own defense, and he asked Judge Thompson to allow him to give his testimony while physically present in the courtroom. Judge Thompson was willing to let Douglas testify telephonically, but he refused to allow Douglas to return to the courtroom. Douglas now appeals that ruling.

The parties agree that the Supreme Court's decision in *Allen* and this Court's decision in *Rae* provide the governing law. The question is whether Judge Thompson abused his discretion under *Allen* and *Rae* when he ruled that Douglas would not be allowed to return to the courtroom to present his testimony.

 In the pages that follow, we present extended excerpts from the transcripts of several court hearings. One of our purposes is to highlight the extreme facts of this case—so that our decision will not be taken as broad approval for trial judges to exclude defendants from the courtroom whenever they engage in disruptive behavior. The exclusion of a defendant from the courtroom can not be justified unless the defendant proves incapable of controlling their disruptive behavior despite admonitions and a clear warning that continued disruption will result in the defendant's removal.

Our second purpose is more case-specific. As explained in more detail below, when Douglas made his request to return to the courtroom to present his testimony, he promised to behave himself. Such a promise would normally require a trial judge to at least temporarily remit any previously ordered exclusion. But we conclude that, under the facts of Douglas's case, Judge Thompson was justified in refusing to credit Douglas's protestation that he would control his behavior.

*Underlying facts that led Judge Thompson to bar Douglas from the courtroom during the trial*

The earliest pre-trial hearings in this case (hearings that took place even before Douglas went to trial on the underlying sexual assaults) show that Douglas was opinionated, assertive, and a generally difficult client for a series of defense attorneys. However, in those early hearings, Douglas never directly challenged the authority of the court. More importantly, whenever he was admonished to stop making inappropriate remarks or to stop speaking out of turn, he would control himself.

But Douglas's behavior became more strident and uncontrolled during and after his sexual assault trial. Douglas apparently engaged in one or more outbursts during that trial; and just after the sexual assault verdicts were announced and Douglas was being escorted from the courtroom, he spit at the spectators, declaring that he hoped they contracted diseases. Following this assaultive behavior, the judge presiding over the sexual assault case—Superior Court Judge Larry R. Weeks—ordered that Douglas be physically restrained at all further hearings in that case.

Shortly thereafter, on November 20, 2003, Judge Thompson held a status hearing in the present case (*i.e.*, Douglas's witness tampering case). At this hearing, Douglas declared that his defense attorney had represented him incompetently at the sexual assault trial. The defense attorney, for her part, asked to

withdraw from any further representation of Douglas in the still-untried witness tampering case.

(The defense attorney also attempted to withdraw from the sexual assault case, so that another attorney could represent Douglas at his sentencing hearing. However, Judge Weeks refused to allow her to withdraw.)

During this pre-trial hearing, Judge Thompson and Douglas discussed Douglas's behavior at the sexual assault trial, as well as Judge Weeks's order that Douglas be physically restrained in future hearings. In this conversation, Judge Thompson warned Douglas that he would be removed from the courtroom if he became disruptive. Douglas assured Judge Thompson that his behavior at the sexual assault trial had been calculated—that "it was all done on purpose"—and that he could behave himself if he wanted to:

*Douglas:* Well, I'm not going to spit on anybody, so you'll see . . .

*The Court:* Well, I think they were worried about that. That's why they . . .

*Douglas:* I know. You'll see, this, this—I'll behave well, and maybe in the next proceeding when we come [to your court], I won't have to be so restrained.

*The Court:* Well, we'll see. I should caution you, though: I'm not nearly as indulgent as Judge Weeks [*i.e.,* the judge who presided over Douglas's sexual assault trial]. He's kind of older and more mellow than I am.

*Douglas:* Oh, no . . .

*The. Court:* And, you know, if you were to get about two words out of line with me, I think you'd probably be listening [to the court proceedings] on [a] speaker phone, and I don't think the [outgoing audio signal from your phone] will be working, either. . . . But, you know, . . . we don't have to worry about that today.

*Douglas:* Yeah, I know. I'm fine.

*The Court:* That's not an issue today. . . . But when the trial rolls around, you know—if we start the trial and you get rambunctious or something, I can't permit that. . . .

*Douglas:* Well, . . . I did that so that my appeal lawyer will be able to hear my complaints, and how they weren't addressed. It's all—and it was all done on purpose. Everything I did had purpose. So . . .

*The Court:* Well, I assume that. . . . But we can't have that[.] . . . I don't think it's so much what [you] said as how it was said. I mean, I wasn't there [at your sexual assault trial], but . . . I got kind of a briefing on it.

Judge Thompson allowed Douglas's attorney to withdraw, and Douglas received a new attorney, Daniel C. Wayne. However, only six weeks later, at a calendar call on January 6, 2004, Mr. Wayne asked to withdraw from the case. Douglas spoke at length at this January 6th hearing—and, based on Douglas's comments about Wayne, about the prosecutor (Assistant District Attorney James T. Scott), and about the trial judge at his sexual assault trial (Judge Weeks), it appears that Douglas's behavior was deteriorating:

*Mr. Wayne:* I regret to say this, but I'm going to have to move to withdraw from [this] case. . . .

*The Court:* You're [under contract with] OPA [the Office of Public Advocacy], right?

*Wayne:* Yes, I am.

*The Court:* Well, do I need to know [the specific problems you have encountered]? Or can you just get [the Public Advocate] to . . . [assign] someone else?

*Douglas:* Yeah, that's all. That's . . .

*Wayne:* I . . .

*Douglas:* [to Wayne] You need to just withdraw, and shut your mouth, and go to another case.

. . .

*Wayne:* I guess . . . if it would work best for [my] client and for the Court, I can call [the Public Advocate] and have him do that. But . . . I want to withdraw from the case. I don't want to be—I don't think Mr. Douglas should be—well . . .

*Douglas:* [to Wayne] Are you educated? Can you speak?

*The Court:* Mr. Douglas, I . . .

*Douglas:* I mean, my goodness, [he] keeps tripping over [his] tongue.

*The Court:* Mr. Douglas, I'm trying to talk to Mr. Wayne, so why don't you just stand by while I finish with [him], and [then,] if you need to say something, we'll talk about it.

[To Wayne] Okay, so you're moving ... to withdraw because what? Apparently, you guys have no relationship? Or at least, if you've got one, it's a bad one?

*Wayne:* I—it's a bad one, and it's irreconcilable. And I don't know how much farther I [can speak] in [explaining] why I have to withdraw, but ...

*Douglas:* He doesn't [have to say anything more]. [To Wayne] I've got a recording of our conversation, pal, so if you think you're going to do that—I asked to have that call recorded, so you just go ahead, and go on with your silliness.

...

*The Court:* Well, ... obviously, [Wayne and Douglas] never made any progress or never reached any kind of an understanding.

*Douglas:* Never. We didn't even talk for ... two months. I hadn't even discussed the case [with him] except for a crazy deal he's concocted with this crazy prosecutor. I'll tell you what: This [prosecutor, Mr. Scott,] is going to end up in jail ... after this is all said and done. He has destroyed evidence; he has manipulated witnesses. And it's all on the record, and [these witnesses] are going to come testify, as soon as it is done. And, Scott, you know it's true.... You're not going to get away with this. It's all on the record. Anybody who reads [the] transcript [of my trial] finds me innocent.

You manipulated the jury. You [commented improperly on my right to remain silent.] That, right there, is enough ... for a new trial. [And you engaged in improper argument in front of the jury.] What kind of courts are [there] in Alaska, where ... a judge allows a prosecutor to do stuff like that in front of a jury, whe[n] there's no evidence to back it [up]? ...

And how do you expect me to have a fair trial, when my lawyer doesn't even object to silly—This is the craziest place I ever heard of.

*The Court:* Are you finished?

*Douglas:* Well, gosh, it just makes me mad. I'm sorry.... I had to get that off my chest, because there's ... a million other things like that, too.

Ten days later, Judge Thompson held another calendar call. The State Public Advocate, Joshua P. Fink, appeared telephonically and informed Judge Thompson that his agency was having problems finding someone to be Douglas's attorney. In response, Douglas told Judge Thompson that he wanted to represent himself. Douglas then launched into a lengthy recitation of complaints about the way his former attorney had mishandled the sexual assault trial. Douglas proclaimed his innocence, and he suggested that he had been convicted of sexual assault through the bad faith and improper conduct of the authorities, as well as the incompetence of his own attorney.

The next hearing in this case occurred on March 2, 2004. By this time, yet another attorney—William B. Carey—had been appointed to represent Douglas. The parties discussed potential trial dates. Apparently, Douglas had still not been sentenced in the sexual assault case, but Judge Weeks was planning to come to Ketchikan three weeks later (on March 24th) to hold the sentencing hearing.

Toward the end of the March 2nd hearing, Douglas suddenly erupted with invective and charges of corruption against the prosecutor. Douglas himself suggested that he should participate telephonically in future hearings, so that he would not have to look at the prosecutor:

*Douglas:* Your Honor? From here on out, ... could I [attend court hearings] telephonically? Because I just don't even want to be around this vile, pig-faced man right here [i.e., the prosecutor, Mr. Scott]. I don't want to be around him. I'd rather have a telephone at the jail than be around this lying ...

*The Court:* Well, ...

*Douglas:* ... son of a ...

*The Court:* Well, Mr. Douglas, . . .

*Douglas:* . . . bitch.

*The Court:* Mr. Douglas, you're going to have to control yourself.

*Douglas:* I can't. This guy stole my evidence. He . . .

*The Court:* Well, we're not going to get into all . . .

*Douglas:* He tampered with my witnesses.

*Defense Counsel:* Mr. Douglas, you know, I can address those issues with [the prosecutor].

*The Court:* This is not the time to get into all of that, I can tell you. You're just going to have to settle down.

*Douglas:* Yeah, you'd better get attorneys where you . . .

*The Court:* Mr. Douglas, you're just going to have to settle down. [To the defense attorney] 2:30 on [April] 12th for [the next] calendar call?

*Douglas:* Yeah.

*The Court:* Is that all right, Mr. Carey [the defense attorney]?

*Defense Counsel:* Yes, I can do that.

*The Court:* Okay.

*Douglas:* Pig-faced mother . . .

*The Court:* [And] if you want to ask for [Mr. Douglas] to be telephonic at the next hearing, . . . we can probably do that.

*Douglas:* Yeah, I'd rather have it telephonic. I don't want to see this fat-ass. . . .

*Defense Counsel:* That might be a good idea.

Three months later, on June 3, 2004, Judge Thompson held a hearing to set a date for the witness tampering trial. Despite Douglas's suggestion that he participate telephonically in future hearings, it appears that Douglas was present in court for this hearing (although his defense attorney, Mr. Carey, was participating telephonically).

The attorneys agreed to a trial date of June 15th, but they alerted Judge Thompson that there would be many motions and procedural questions to decide before the trial commenced, and they asked the judge to allow sufficient time for the presentation of these pre-trial motions before the actual trial began.

Douglas then interrupted, proclaiming at length that the prosecutor was suppressing evidence that would have demonstrated his innocence of the sexual assault charges, and that his own attorney was refusing or neglecting to file important motions. During his remarks, Douglas insulted and swore at his own attorney, the prosecutor, and Judge Thompson. In the end, Douglas's behavior led Judge Thompson to declare that Douglas would be excluded from further hearings in the case:

*Douglas:* Mr. Carey won't be representing me if he hasn't filed the motions that we've talked about.

*The Court:* . . . You wanted to say something, Mr. Douglas?

*Douglas:* Yes, I do. Mr. Carey—I don't know what he's [been] doing, but he's been—he just now got my medical reports from me yesterday. He hasn't gotten any discovery from any of the other [defense] attorneys[.] . . . And he's been telling me to take this deal for eight months, and I've been telling him to file a motion to get the colposcopic photos that were suppressed by Mr. Scott [the prosecutor]. Every district attorney, for the last twenty years, when there's a violent rape, the first place they go is a colposcopic finding for . . .

*The Court:* I'm not sure I know what that is.

*Douglas:* . . . gynecolog[ical]—well, okay. We've got to prove that there's no tearing. [The prosecutor] said that there was "fisting" going on. . . . And there's no evidence [to support that]. And, also, [the prosecutor] had a—we've got issues about the expert witnesses.

*The Court:* Well, let's just take [these issues] one at a time. Mr. Scott, does the State have . . . this [colposcopic] photo?

*Prosecutor:* No, no. . . . Colposcopic photos are used as a diagnostic tool [by] physicians. I don't use them, and I haven't used them since the *Ragsdale* [case].

*Douglas:* That's because you're a fucking crook.

*Prosecutor:* I haven't used them since the *Ragsdale* trial because jurors don't like looking at those photos. So what I ...

*Douglas:* You're just brain-washing my dumb-ass [defense] attorneys.... There's nothing vulgar about [those photos].

*Prosecutor:* So what I do is ... use diagrams and testimony—which I used to convict Mr. Douglas in [his] other trial.

*Douglas:* You're a liar, is what you are.... They're internal photographs. They're nothing like you'd see in some men's magazine.... People can't even see what they are. So quit lying. Quit lying to the public. And you're just a liar, James Scott.

...

*Defense Counsel:* Your Honor, if Mr. Douglas will cool it for a second. We have some strategic disagreements.... I think I've been around for long enough to know what kind of decisions ...

*Douglas:* Hey, hey. No, no, no. You let me finish. I haven't finished.

*Defense Counsel:* ... are an attorney's decision ...

*Douglas:* That's not "strategic". [*See* Alaska Professional Conduct Rule 1.2(a).]

*Defense Counsel:* ... and I think I know which decisions are [for the] client ...

*Douglas:* That [decision] is not "strategic". [The prosecutor] said there was tearing [of the] vagina. This proves that there was no tearing. And, also, in the written report from Doctor Meloche, he states [that] there's no tearing.

*The Court:* Well, I guess we'll see what he says.

*Defense Counsel:* Your Honor, I'm prepared to go ahead with the trial.

*Douglas:* No, you're not. You're not representing me, you mother-fucker. You get off my case.

*The Court:* Mr. Douglas?

*Douglas:* You get the hell off my case, Bill Carey. If you stay on my case, you will never practice law again.

*The Court:* Mr. Douglas, it looks like the trial will occur without your presence.

And, right now, you're not even going to be brought over here ...

*Douglas:* Fuck you, you mother-fucker.

*The Court:* I'm sorry, what was that?

*Douglas:* Fuck you.

*The Court:* Well, I think that [those remarks] just confirmed my earlier thoughts. We're going to hold the trial, [but] Mr. Douglas will not be participating.... We'll see you here, Mr. Carey, and we'll do that [pre-trial motion] hearing at 3:00 on the 14th [of June].

*Defense Counsel:* Well, I reserve my objection to my client not being present at this trial.

*The Court:* Well, I understand that. But, obviously, he can't control himself. I can't have him here in the courtroom carrying on like that. So we'll have our [pre-trial] hearing on the 14th and on the 15th. And, you know, if Mr. Douglas could talk me into letting him participate in the trial—I'd probably give him a chance to try to talk me into it by telephone. I don't think I'm going to do it face-to-face, though.

...

*Defense Counsel:* Well, like I say, I'll reserve my objection. I understand the Court's concerns, at the same time.

The pre-trial motion hearing was held on June 14th. Despite Judge Thompson's statement (on June 3rd) that he would only allow Douglas to participate by telephone at this hearing, Douglas was in fact transported to the courthouse, and he personally attended this hearing.

Early in the hearing, Douglas's attorney announced that Douglas's defense to the witness tampering charges would be the assertion that Douglas was actually innocent of the sexual assaults charged against him—so that when he urged his girlfriend to testify that he was innocent, he was simply urging her to tell the truth.

The defense attorney's announcement led to a four-way conversation in which Douglas again gratuitously insulted the defense attorney, declared that the attorney was incompetent, and asked Judge Thompson to dismiss the attorney and appoint a new one. Doug-

las also again gratuitously insulted the prosecutor and declared that the prosecutor was guilty of criminal conduct.

Toward the end of this conversation, Douglas launched into a soliloquy that was unrelated to the procedural issues that the attorneys and the judge were discussing—a soliloquy in which Douglas asserted that the evidence showed that he was innocent of the sexual assaults.

Based on Douglas's behavior, Judge Thompson again ruled that Douglas would not be allowed to attend the trial. Here is the pertinent excerpt:

*Prosecutor:* If [Douglas's] defense is [that] this rape didn't happen, [and that he] was just telling [the victim] to tell the truth [by testifying that] it didn't happen, ... then the only way the State can counter that, and probably in the form of [a lengthy] rebuttal case ...

*Douglas:* Listen—I'm going to win my appeal, you fat-ass.

*Prosecutor:* ... is [to present] the rape case [again]. We can say, ... "No, actually, he *is* telling her to testify falsely—because look at the photos of [her] bruises; hear what Dr. Meloche has to say about the injuries to the perineum." And it'll take—[well,] it took over a week [to present that evidence] last time.

*Douglas:* That's exterior [injuries you are talking about]. That's [got] nothing to do with penetration. Penetration is rape, you fucking dumb-ass.

*Defense Counsel:* Listen, you (indiscernible—simultaneous speech).

*Douglas:* Excuse me. I can't take this. He's a liar.

*Defense Counsel:* You need to just sit and keep quiet.

*The Court:* Try to take ...

*Douglas:* Pig-eyed liar. He's going to hell.... [To the prosecutor] You're going to be swimming with [the victim, K.I.] in the lake of fire, you fucking fat pig. That's what I meant by going swimming, you pig-faced bastard.

*The Court:* Well. Let me note that ... one reason I had Mr. Douglas brought [to the courthouse] today, instead of doing this by phone, was just to see if there had been any ...

*Douglas:* Well, I just can't sit here and listen to lies, Your Honor.

*Defense Counsel:* Well, you have to just sit here ...

*The Court:* ... if there had been any change in his attitude. And there hasn't been. I'll have to think about this overnight, and try to tell you what, if any, response—how I ...

*Douglas:* I would like to speak. If he is going to speak, I want to speak.

*Defense Counsel:* You're going to lose your right to speak when you're abusive like that. So you've got to sit there and keep cool.

*The Court:* I'll let [the parties] know tomorrow ... how, [or] if at all, I'll limit the introduction of evidence [that] would amount to a re-trial of the rape case—because I really don't think we should be re-trying [that case]. And, obviously, to the extent that it becomes relevant, the fact that [Douglas] has been [convicted]—you know, at least a previous jury felt that there was sufficient evidence ...

*Douglas:* Oh, that's because [the evidence] was false. False. Everything was perjured ...

*Defense Counsel:* Mr. Douglas, ...

*Douglas:* ... and false.

*Defense Counsel:* ... just let me ...

*The Court:* Mr. Douglas, your point of view is crystal clear. I've never had any trouble at all understanding what ...

*Douglas:* Well, I can prove it all, too.... You get all the evidence right here, and I'll ... point you right here, and ...

*Defense Counsel:* Mr. Douglas, let me just ...

*Douglas:* ... and show you that [the prosecutor] lied during the whole course of the trial, and my lawyer didn't do a damn thing.... [And] I'm not going to sit here and let this happen to me again.

*The Court:* I understand your *weltan[schauung]*, your world view on this. And what I'm going to do on the ...

*Douglas:* And there's no way to . . .

*The Court:* I guess the chief question that I thought was in front of us today was, you know, "What would Mr. Douglas's status be during the course of the proceeding?" And you know, . . . let me just say this: . . . I think [that Mr. Douglas] has been asking Mr. Carey to do things that Mr. Carey knows [either] he can't do because the rules don't permit it, or [else] it's not even in Mr. Douglas's interest . . .

*Douglas:* Oh, no.

*The Court:* . . . to do it.

*Douglas:* Oh, no. . . . They're going to show exterior . . .

*Defense Counsel:* You need to . . .

*Douglas:* . . . photos.

*Defense Counsel:* You need to be quiet for a second.

*The Court:* Mr. Carey will have to be permitted to try [this] case as lawyers try cases, by . . .

*Douglas:* Okay, Your Honor?

*The Court:* . . . following the rules, because . . .

*Douglas:* Can I put this on [the] record?

*The Court:* . . . as I said, . . . Mr. Carey could lose his . . .

*Douglas:* This has nothing to do with licenses.

*The Court:* . . . or get himself in trouble if he didn't follow the rules. . . . [And] let me say that I expect Mr. Carey to follow the rules and try the case that way—which I expect he has every intention of doing, in any event.

*Douglas:* Okay, we're going to have—we're going to have another . . .

*The Court:* With respect to Mr. Douglas's participation . . .

*Douglas:* . . . plain error if you don't put those photos in.

*Defense Counsel:* Shh.

*The Court:* With respect to Mr. Douglas's participation in the trial, since he can't control himself and hasn't been able to [do so] for . . .

*Douglas:* Well, what do you—what would you do? I mean, if you're getting raped—I'm the only one . . .

*Defense Counsel:* You're . . .

*Douglas:* . . . [who has] been raped in this—this freaking whole episode.

*The Court:* Since he hasn't been able to control himself for the last several hearings, I think my only option . . . is to have Mr. Douglas downstairs on the third floor [of this building], in the room that he was in when he was sentenced [for the sexual assaults] by Judge Weeks, and he'll have some . . .

*Douglas:* That's prejudicial, right there. . . . I didn't—I didn't go out of control [at my] last trial . . .

*Defense Counsel:* Mr. Douglas, just be quiet.

*Douglas:* . . . in front of the jury.

*The Court:* In normal circumstances, . . . Mr. Douglas would be correct.

*Douglas:* [apparently, to the prosecutor] And you're going to jail, too, you lying bitch. You fucking stole my evidence.

*The Court:* Well, at any rate, that's the way we're going to do it tomorrow. And he'll be downstairs in the . . .

*Defense Counsel:* Your Honor, I'm sorry . . .

*Douglas:* [again, apparently to the prosecutor] You fucking think it's funny? You stole my fucking evidence out of the fucking—you stole letters that [my girlfriend] wrote, and they're missing still.

*The Court:* [to Douglas] Just keep rolling. [To all] That's the way we're going to have to do it. . . . I can't conduct a trial in this kind of atmosphere. I mean, the jury . . . would be looking for ways . . . to throttle Mr. Douglas, [much less] convict him. And, you know, under the circumstances, he can't get a fair trial if he's in the courtroom.

*Douglas:* Shit, I haven't got a fair trial—[a fair] shake since I've been here. This is all lies. I could prove it. It's all on the record. It's all on—other [evidence] that [my defense attorney at the sexual assault trial] didn't bring up. . . .

*Defense Counsel:* Your Honor, . . . [the prosecutor] has suggested that maybe the jury would get an instruction . . . that [Mr.

Douglas has] already been convicted of the rape. I assume [that] that's not going to happen.

*The Court:* Well, I may or may not permit [the victim] to answer questions to that effect—or somebody to answer such a question. I don't know about [the propriety of] handing [the jury] an instruction saying that. That, I would rather not do. I'd rather have it come from a witness [rather] than from me.

*Defense Counsel:* Yeah, well, I don't think that [information] should come in, period.

*The Court:* Although I could take judicial notice of such an event, because it's part of the court records.

*Douglas:* There's going to be some photos that are going to come in. Are you going to have plain error? We'll be doing this all over again, just like [my] last trial. It's going to be re-done, I promise you. Plain error.

And [the prosecutor] made so many comments in his opening and closing statements that it's almost like he went down every list of not-to-do's in the [book]. It's amazing. He brought up so much stuff, it's amazing.

. . .

*Defense Counsel:* If Mr. Douglas will just shut up for a second, I would like to ask [the Court] for a protective order that no mention of [Douglas's] conviction in the rape case be brought up under any circumstance.

*The Court:* I said [that] I'm going to think about it overnight. . . . That conviction . . . is technically a hearsay finding by [twelve] people who [won't be] present [at the witness tampering trial]. The twelve jurors who found him guilty [of sexual assault] aren't here.

*Defense Counsel:* I agree.

*Douglas:* The only doctor . . .

*The Court:* They aren't going to be testifying. So, yes, . . .

*Douglas:* The only doctor that saw her . . . was a prison doctor, a state employee. . . . He gets [his salary from] the same place . . . that you do[.] . . . And he's got malpractice running up and down the coast.

*The Court:* [to the attorneys] Well, you know, . . . I can't compete . . .

*Douglas:* Is it . . .

*Prosecutor:* I disagree with the court's hearsay finding.

*The Court:* My voice isn't strong enough to compete with Mr. Douglas's.

*Douglas:* Unbelievable.

*The Court:* But he'll be downstairs tomorrow, hearing everything that occurs. [And] we'll take frequent breaks.

*Douglas:* And his opinion is unscientific on that, too. There was no scientific evidence [to support] his opinion.

*The Court:* There will be frequent breaks [in the proceedings], where Mr. Carey can have an . . .

*Douglas:* There was no tearing, no nothing.

*The Court:* . . . opportunity . . .

*Douglas:* A little hemorrhoid didn't cause all that freaking . . .

*The Court:* . . . to . . .

*Defense Counsel:* [to his client] Just shut up, will you?

*The Court:* . . . confer with Mr. Douglas.

*Douglas:* Okay? We've got to have those photos.

*The Court:* Are there other pre-trial issues that we should discuss, since we're all here?

. . .

*Douglas:* I've got—I, I—wait a second. I am putting in right now: Sullivan Moquin [phonetic] raped her three months before I did. You can ask Chris Poag. I talked to Chris Poag. He was going to testify [at the sexual assault trial], but the judge wouldn't let him testify.

*Prosecutor:* That's not accurate.

*Douglas:* Judge Weeks wouldn't let him. Yes, it is true. [He] went back and [asked], "Is that true, [K.I.]?" And she goes, "No." Yeah, it is true. They're both fired since then.

[To the prosecutor] There's an FBI investigation going on, and your ass is grass,

too, pretty soon. I told you [that] your fat ass is going to be in orange [*i.e.,* in a prisoner's jumpsuit] here, pretty soon, ... and you're going to be there, [Mr.] Scott.

*The Court:* I can't say [that] I'm going to miss Mr. Douglas.

*Douglas:* [to the prosecutor] The way you carry on and on, I wouldn't doubt [that] your daughter's hymen is freaking ruptured from yourself.

*The Court:* I think we're done.

*Prosecutor:* I've got a problem with that, Your Honor.

*The Court:* Yeah, I think we're done.

*Douglas:* You sick bastard.

*The Court:* Yeah, I think we're done.

*Douglas:* Hey, ...

*The Court:* Actually, ... I think we should discuss [the remaining matters] without Mr. Douglas.

*Douglas:* Fucking pig. Hey, you are fucking going down, you fucking asshole. Hey, you better get the pictures, the colposcopic pictures in, or it's going to be plain error. It's going to be fucking over. I've got a few other things to put on [the] record right here.

[Douglas then engages in a lengthy recitation of various pieces of evidence which, he contends, show him to be innocent of the sexual assaults.]

*Defense Counsel:* Mr. Douglas, [all of] this has nothing to do with anything right now.

*Douglas:* Yes, it does. You're ignorant. You're fired. You're fired for not doing this. [To the Court] He's not doing his job. He's been trying to get me to take a deal. They've offered me a deal with no time to serve, zero time, if I plead guilty to one felony.... Just plead guilty. Do you know why? So it will look bad for my appeal—because they know [that] I'm going to win my appeal.

*The Court:* I couldn't comment on what their intentions are.

*Douglas:* This is insane. I mean, why would you offer me a deal with no time [to serve] for one felony?

*The Court:* I don't know. I don't know, but I'm not going to ask.... Okay, we'll see you guys ...

*Douglas:* Well, no one has told me that. If they'd tell me that—if they told me it wouldn't hurt me, we'd drop all this.

*The Court:* See you guys tomor ...

*Douglas:* If they told me [that] it wouldn't hurt me on appeal, and I could get him to say that in writing, I would—I would—we could just go home. We'd all go home. I'd plead guilty to ... tampering if it didn't hurt my appeal in the other case.... [It would] save us all a lot of trouble if he'd put that on the record.

*The Court:* Mr. Douglas, I don't know if it would hurt or help. At any rate, I'll see you guys in the morning.

*Defense Counsel:* Yes.

*The Court:* [And] Mr. Douglas will be downstairs, where you [can] have access to him as often as you like.

*Douglas:* Hey, this guy is fired if he doesn't do that—get the pictures. And if he doesn't do that, he's fired.

*Defense Counsel:* Well, that (inaudible).

*Douglas:* He's already—he's told me to plead guilty. He's begged me to plead guilty. I won't plead guilty.

*The Court:* See you in the morning.

*Douglas:* [to the Court] What are you going to do? Are you going to fire him for [me]? Are you going to let me get a new lawyer, or what?

*Defense Counsel:* I don't intend to withdraw.

*The Court:* We're going to have a trial tomorrow, starting at nine o'clock. So [I'll] see you folks at nine, then.... I had your client brought over, Mr. Carey, frankly, because I had a feeling that he was going to carry on.... I just wanted to ... see if he had a change of heart, and he hasn't had [one].

So ... [Mr. Douglas] will be in the conference room on the third floor [of the courthouse].... He'll have two [Department of Corrections] personnel with him. He can raise all the hell he wants down there.... When and if we get to [the] stage [of the trial] where he might or

might not be a witness, ... that's an altogether different matter....

*Defense Counsel:* I believe [that] he intends to be a witness.

*The Court:* Well, I don't believe that he can be ... prohibited from doing that. But at least the rest of the trial should go relatively smoothly.

The next morning (June 15, 2004), when the court convened for Douglas's trial (with a pool of prospective jurors waiting in another room), Judge Thompson gave a more formal explanation of his decision to exclude Douglas from the courtroom during the trial:

*The Court:* Mr. Douglas ... waived his right to be personally present ... [or] I guess a better word, actually, would be "forfeited". But at any rate, ... despite my pressuring and cajolery and threats ... to get him to conform his conduct to the normal conduct we expect during court proceedings, he [remains] disruptive[.] We just wouldn't be able to [conduct] the trial if he were physically present. He just can't keep quiet.... He has to do all the talking. And I don't mean [just] speak[ing] for himself [as opposed to speaking through his attorney]. I mean [that] he has to do all the talking, and nobody else can get a word in edgewise. And, under those circumstances, ... he would just simply prejudice the jury against himself. And [my other] choices are, either by mechanical or medical means, [to] subdue him, and ... I'm ... simply not going to drug or duct-tape a defendant. I'm just not going to do it....

I intend to take frequent breaks, pretty much at Mr. Carey's option, whenever he calls for one, so that he can confer [with Mr. Douglas] to the extent that he wishes to, or Mr. Douglas wishes to confer with him.... I want them to have plenty of contact [with each other—outside] the jury's presence, of course. And we'll do that.... I don't know of any other way to do it.

If anybody has a suggested procedure short of that, I'd be glad to hear it.

*Defense Counsel:* No, Your Honor. I think that under ... *Rae [v. State]*, you've got a couple of options, [but the option

that] the Court has just announced [is] probably ... the best one for right now—still reserving my [previous] objection.

The defense attorney then informed Judge Thompson of an event that had occurred the previous evening—an event that would delay Douglas's trial for another eleven weeks:

*Defense Counsel:* Your Honor, if you're prepared to move on, there's been another situation that has arisen in the past fourteen hours or so ... that you need to hear about.

Mr. Carey proceeded to inform Judge Thompson that, on the previous evening, Douglas had punched him in the face when Carey went to the jail to confer with Douglas about the case.

Carey told Judge Thompson that he had consulted the Bar Counsel (*i.e.,* the Alaska Bar Association's discipline counsel) concerning his ethical obligations in such a situation, and (apparently based on that conversation) Carey declared that he did not wish to withdraw from the case. However, Carey asked Judge Thompson to order a competency examination for Douglas.

*Defense Counsel:* [He and I] have had, as the Court is aware, disagreements about strategies and that kind of thing.... But I think it has moved beyond that point. Mr. Douglas is completely unable to assist [me] in the preparation of the defense. I cannot get him to focus. He got violent with me last night at the jail [and] did punch me.... I'm not saying [that] he doesn't understand the proceedings against him. But he is completely unable to assist counsel—and ... it goes beyond [his] disagreements with [me]. He's just not able to focus.

A few minutes later, Carey added:

*Defense Counsel:* I want to make it clear [that] I'm not moving to withdraw. I didn't ask for this to happen last night; it's obviously disturbing. But I think it [speaks] more to the [lack of] competency of this defendant. It may be that there is a ... mental defect that can be controlled by medication or otherwise [so as to] allow him to assist ... and to participate in his trial.

. . .

I'm not afraid of him. I think he's going to be properly restrained [in the conference room]. I've already spoken to Judicial Services . . . to ensure that he was restrained while I was in his presence. . . . But as far as actually getting anything done [during my conversations with him], being able to rationally discuss matters affecting [his] case, his future, I don't think [that] that's going to be possible right now. And I don't think it's a matter of just myself. I think it's a matter of Mr. Douglas and whatever demons he's dealing with.

In response to the defense attorney's remarks, the prosecutor asserted that Douglas was not suffering from any mental illness—that Douglas was perfectly capable of assisting in his defense if he wished to. The prosecutor contended that Douglas was purposefully disrupting the proceedings:

*Prosecutor:* [Douglas has made a] conscious decision to be disruptive and threatening. And that sort of [behavior] is something that he has turned on and turned off throughout the course of all of his cases. . . . When he believes that it suits him to be meek and [to] present himself as the victim, he'll do that just as quickly. And sometimes he'll turn on a dime. . . . Mr. Douglas is a remarkably manipulative guy. . . .

Judge Thompson indicated that he tended to agree with the prosecutor, but he believed that he was obliged to investigate the possibility that Douglas might have a treatable mental illness—and the possibility that, if the mental illness could be treated or otherwise ameliorated, Douglas would then be able to attend the trial:

*The Court:* I guess we'll release the jury, and I'll . . . order . . . Mr. Douglas . . . to API [the Alaska Psychiatric Institute] and have an evaluation done. Although my gut feeling is that we're just going to get [a diagnosis of] "oppositional conduct disorder"—in other words, he's grumpy. . . .

Mr. Carey has a point, though, and I shouldn't depreciate [what could be] outward manifestations . . . of mental illness. . . . It could be that [the prosecutor] is wrong, and that Mr. Douglas really can't control himself. . . . Although at times he may . . . put on . . . different facade[s], he may have lost the ability to decide which one to wear at the appropriate time. And, you know, if that's the case, [and if his condition can be treated], then I would much rather have . . . a placid Mr. Douglas here in the courtroom during [the] trial. I mean, that clearly is far preferable to what we're doing right now.

A little over two months later, toward the end of August 2004, Judge Thompson held a hearing to announce the result of the mental examination: the psychologist from API had concluded that Douglas was competent to stand trial. In particular, the psychologist concluded:

[Douglas's] choice not to cooperate with his defense counsel . . . is not the product of a mental disorder or defect; rather, it is [the] product of his over[-]controlling personality disorder [and] his belief that he has a legitimate legal defense which would be undermined by following his attorney's advice. . . . [Douglas's] resistance and uncooperative behavior is a form of protest of the serious and grave circumstances he is in, and he may be expected to publicly display his dissatisfaction with the criminal justice system in the form of inappropriate tirades in the courtroom. [He] is capable of conforming his behavior to courtroom protocol. He is just not willing to do so[, and he] can be expected to publicly vent his frustration. . . .

The psychologist added that Douglas

is able to calm down and . . . behave in a fairly civil manner when he is not talking about his legal case[; but] whenever the discussion turns to the charges against him, [or the] characteristics of his crime, and/or discussions about [the] victim or the District Attorney, [Douglas] becomes extremely angry and threatening[, although his] thought processes . . . remain organized, coherent, and well-connected. . . . He is extremely angry with the victim, his own attorney, and the District Attorney's Office, [all of] whom he accuses of . . . conspiring against him.

When Judge Thompson announced the result of the mental evaluation, Douglas responded with another rambling protestation that he had been unjustly convicted of the sexual assaults, and he again asked Judge Thompson to appoint him a new attorney, but the judge again refused.

Douglas's trial commenced on the morning of August 31, 2004. When court convened, Douglas was participating telephonically from a conference room on another floor of the courthouse. The judge and the attorneys began to discuss the issue of whether the prosecutor could introduce evidence of Douglas's sexual assault convictions if (as discussed above) Douglas pursued the strategy of asserting his innocence of those charges.

The prosecutor stated that he did not wish to prevent Douglas from asserting his innocence, nor did he wish to completely re-try the sexual assault charges at Douglas's witness tampering trial. Instead, the prosecutor simply asked permission to introduce the fact that Douglas had been convicted of the sexual assault charges. At this point, Douglas interjected, "But I've got an appeal [of those charges]." Judge Thompson responded, "You can say that, too."

Douglas then launched, unprompted, into another extended declaration that the sexual assault charges were completely false:

*Douglas:* Hey, I can get up there [*i.e.,* on the stand] and say that there's no evidence of what she [*i.e.,* the victim] says. She says [that] she was torn. The doctor says no, she was—no tears. I can prove [that] everything she said on those tapes are lies. As a matter of fact, everything she says, I can prove is lies; and everything I said on those tapes, I can prove to be true with hard evidence, material evidence.

*The Court:* [to the corrections officers] Can we disconnect Mr. Douglas so we don't have to listen to him?

*Corrections Officer:* I will, Your Honor.

*The Court:* Yeah, I didn't ask Mr. Douglas for any comments. . . . Mr. Douglas will be on the speaker phone in the sense that he can hear what's going on, but we don't need any contributions from him.

*Douglas:* I protest this, and object. This lawyer [*i.e.,* Mr. Carey] is not my lawyer. He was punched in the face because he attacked me. He was smiling down here [in the conference room] at me, like he's going to—he's going to lose the trial. Do what you will, but this isn't going to work.

A few minutes later, Douglas's defense attorney asked Judge Thompson if he was going to explain to the jurors why Douglas was not in the courtroom. During this discussion, the defense attorney acknowledged that, given the circumstances, and given this Court's decision in *Rae,* Judge Thompson had probably adopted the correct course of action when he ordered Douglas excluded from the courtroom:

*Defense Counsel:* I think we need to discuss how [to] advise the jury panel of [Mr. Douglas's] absence . . . and the reasons for that. . . . Shouldn't we advise the jury as to why he's not present in the courtroom, or at least say some . . .

*The Court:* Well, I'd rather not. I mean, . . . it prejudices him, I think, to [tell the jurors] that he [is] incapable of being quiet.

*Defense Counsel:* Yeah. I noticed, Judge, [that] in the *Rae* case—which is somewhat similar to the situation . . . here, . . . an obstreperous defendant, [the trial judge ordered him] bound and gagged. . . . And . . . the Court [of Appeals] essentially said, you know, "That's not how to do it." The best way is to do it the way we're actually doing it [here].

[But] in [the *Rae*] case, [the trial judge] advised the jury that . . . the stress of trial had been too much, or was affecting the [defendant]. [That kind of explanation] is just better for everyone. I don't think [that] we need to say that [Mr. Douglas] is going to yell and scream, or anything like that.

*The Court:* I wasn't going to say much of anything. I was just going to say [that] he is present by speaker phone, and . . .

*Defense Counsel:* All right.

*The Court:* . . . leave it at that. I . . .

*Defense Counsel:* That's probably sufficient.

Judge Thompson then explained again, for the record, why he had excluded Douglas from the courtroom:

*The Court:* If I [haven't] said this clearly before, I don't think this was really my choice. I think this was forced on me ... because Mr. Douglas just wouldn't or couldn't let anybody else get a word in edgewise. If he is in the courtroom, nobody else will get to talk, and ... we won't get very much accomplished.... We can't try the case with his personal participation, because he just simply cannot or will not ...—the psychiatrist [*sic:* the psychologist from API] seems to think that it's "will not"—permit the trial to go forward in a civilized way.

And I ... can't subject the jury to that. [The jury would] be here for days and days, ... because Mr. Douglas has lots to say, and he likes to say it often and repetitively, and a lot of it isn't admissible[.] ... [His statements are not] under oath, [and they are] just all over the place.... We just can't get anything done with him in here.... I wish it [were] otherwise, but it isn't.

*Douglas's later request to come to the courtroom to present his testimony*

The jury selection at Douglas's trial took one day (August 31, 2004), and the rest of the trial (the attorneys' opening statements, the presentation of evidence, and the attorneys' summations) took place on the following day, September 1, 2004.

Toward the end of the presentation of the evidence, and outside the presence of the jury, Judge Thompson had the corrections officers re-activate the outgoing voice signal of Douglas's telephone, so that Douglas could be heard in the courtroom. The judge then asked Douglas if he wished to testify, and Douglas declared that he did wish to testify—but only if he could deliver his testimony from inside the courtroom:

*Douglas:* Yes, I want to testify, and I want to be present in front of the jury. I want [ ] them to see a face rather than a picture. They cannot convict a picture. He didn't file for absentia. [*sic* ]

And I know that this is the biggest farce I've ever heard of—that she [*i.e.,* K.I.] got to testify without being in front of me. I get to confront my accusers, and the witnesses against me. They have to see me, and [give their testimony] in front of my face.

I have—There are several ways to do that. You could put me in a chair and gag me, but I get to see eye-to-eye these people that accuse me of this. And I'm going to appeal this, and this trial didn't take place.

*The Court:* Well, I ... again, my question is, "Do you wish to testify under oath in front of the jury?" ... My intention is to have you do it by phone. But do you want to testify?

*Douglas:* Only if I get to testify ... face-to-face to the jury. That's the only way I will testify, and that's the only way it's proper. And I protest if I do not [get to testify in this manner].

*The Court:* Yeah. See, I'm afraid I can't permit that. I think the choice ...

*Douglas:* [Then] I will not testify. I will have to be in front of [the] jury, to let them see me as a person and judge me as a whole person, not just a voice.

*The Court:* Well, I don't know. Counsel, any comment? I made the decision ... that I couldn't have Mr. Douglas in the courtroom because he didn't seem to be able to control himself. And the only way to control him is to be able to cut him off if he goes off on a tangent or something—[not only] to avoid him prejudicing ... his own case, but ... probably causing a mistrial[.]

...

*Defense Counsel:* I certainly am sympathetic [to] the notion of any criminal defendant wanting to be able to face his accusers, and that's the way to do it. Obviously, there have been problems in this case.

*The Court:* Well, I think [that] the right to confrontation [*i.e.,* the right to face one's accusers] is a different matter than [the] question of whether or not he's going to

testify now. I understand his confrontation issue.... I reluctantly conducted the trial in this fashion, and ... this was not my preference.... I don't like doing it [this way].

*Defense Counsel:* ... If Mr. Douglas wants to testify, ... that is certainly his right. [But] I am concerned about the scope of his testimony. I'm afraid that it might get off track. And I've advised him ... of my concerns in that regard. And I'm not sure what mechanism we can possibly have, if any, ...

*The Court:* [We] don't have [a] mechanism. If we had some sort of video setup or something, then the jury could see him [but we would still be able to control his presentation]. But we don't have any equipment like that....

. . .

*Defense Counsel:* Yeah. Well, I'm concerned about [the] content [of what Mr. Douglas might say], too. I'm afraid that [his] testimony may—It's not usually my place to object to my own client's testimony, but it may ... get irrelevant; it may get way out of ...

*The Court:* Yeah, I saw the [psychologist's] opinion, and what he expected would probably happen. Mr. Scott [the prosecutor], do you have any suggested ...

*Prosecutor:* ... Because of [Mr. Douglas's] spitting and lunging issues, ... if the Court is inclined to ... bring Mr. Douglas [into the courtroom], I would simply ask that we consult with the [officers] who have to keep a hand on him—on how we keep him from spitting on us and lunging at us.

. . .

*The Court:* Wait, wait, wait. I hope I didn't mislead anybody. I don't have any intention of bringing Mr. Douglas into the courtroom while the jury is in the courtroom.... We're not all going to be in the courtroom together....

. . .

*Douglas:* Oh, this is going to go somewhere else—to Juneau, where they can— [Apparently, to the prosecutor] You're a fucking moron. And so is this Court. I ...

[At this point, it appears that one of the corrections officers muted the sound from Douglas's telephone.]

*The Court:* The point is [that Mr. Douglas] wants to testify, but he can't confine himself to relevant matter. He won't answer [the] questions [put to him].... Because I've tried to ask him questions during [the] hearings [in this case, and] he will not pay any attention to the question I ask; he won't answer the question I ask. He just wants to make speeches. And his speeches ramble, and [they] include all kinds of prejudicial material ... against ... [the victim], against Mr. Scott [*i.e.*, the prosecutor], against his own attorney— [leaving] aside ... what he thinks about me....

If he comes in here and carries on like this—which is the only way I can assume he will carry on, because [at] every hearing [over] the last six months, he's carried on like this—the jury is going to make short work of the verdict in this case. They're going to see somebody that probably ought to be locked up, and that's all they're going to [pay attention to].

I don't take this [step] lightly—because, in effect, [this] strips him of certain constitutional rights. But, you know, he's doing the stripping; I'm not. I ... simply can't permit him to come in here and turn this place into a circus[.] I'm just not going to do it.... I can't permit [him] to come up here and carry on in this fashion, in this high-handed fashion that he insists on[.]

Judge Thompson then had the corrections officers re-connect the outgoing voice signal from Douglas's telephone. Without waiting for a question from the judge, Douglas began speaking:

*Douglas:* [I will] testify; I will testify. [But] I want to see the jury eye-to-eye. That has to happen. I want to testify[, but] I will not speak to a [telephone] speaker. That is not the jury.

*The Court:* Well, if—Mr. Douglas, ... the Court has made its ruling. [You're] not going to be in here. So, Mr. Douglas,

the question is, will you testify from [the conference] room?

*Douglas:* I will testify to the jury, so that they can see my face when I'm telling them the truth. That's all I want—[to] tell the story of this entire episode, and exhibit the proof [of my innocence], which my lawyers did not do.

I have all the proof: documents, medical records, everything that proves that she [*i.e.,* K.I.] is a liar and [that] everything I said is true. I want to do that in front of the jury unimpeded.

I didn't act up in front of the jury [at my] last [trial] until after the verdict [was announced]. We were fine with the jury. I sat there through the whole trial. I didn't want to mess up in front of [that] jury, and I don't want to mess up in front of this jury [either], and I won't.... I'm not going to sabotage myself in front of the jury; I'm going to show myself calmly.

However, having made this promise to conduct himself in an orderly fashion, Douglas immediately (that is, with no intervening conversation) launched into another extended assertion that he was innocent of the sexual assaults—and that his conviction of those crimes was due to a combination of perjury by his girlfriend, corrupt dealings by the government, and the incompetence of his own attorney.

When Douglas finished, Judge Thompson declared that he could not allow Douglas into the courtroom, and Douglas's attorney responded, "I'm not asking you to."

Here is the pertinent excerpt from the transcript:

*Douglas:* ... I'm going to show myself calmly. And that's what's killing me right here: I can't show myself. The thing— and these lawyers didn't spend enough time with all these records. I know exactly. I've been over this for two years—over everything that happened—and these people don't know.

But she [*i.e.,* K.I.] didn't have the letters. Two letters disappeared. She didn't—and those records show that she didn't receive a call in her home from the jail that had any (indiscernible), no time on

it until September 7th. The letter ... in question, [the letter] that she wrote, was written September 6th. It's dated a big "September 6". That letter disappeared too, for this trial. Isn't that kind of suspicious? That now three letters are gone? And that letter is supposedly—that came up missing—that Kristen Swanson [*i.e.,* Douglas's defense attorney at his sexual assault trial] says, "Yes, we lost letters during your trial." They [would have] ruined the State's case, and they came up missing.

*The Court:* Yeah, ...

*Douglas:* Now, this letter that clearly states "September 6th" in a big, happy handwriting, neat and clean ...

*Defense Counsel:* It's coming in, Mr. Douglas. We're going to produce [that letter].

*The Court:* Yeah, we're going to get the letter.

*Douglas:* Okay. But then you're going to have to show that ... the forms from the jail, there was—they look—punch her phone number into the computer, and there wasn't a call until September 7th. She [*i.e.,* K.I.] was visited September 6th by those lawyers, and her—and Susan Crocker. She accused Susan Crocker of strong-arming her. That's why Susan Crocker got off the case.... But she did put that on [the] record, and I have it in Sharon Zink's report, that Sharon Zink wrote in her [own] handwriting, that, yes, [K.I.] accused us of strong-arming her to write that letter of testimony.

*The Court:* Well, ...

*Douglas:* They're lying. That's what I have to do. If my lawyers will not show the proof [of my innocence], I have to show it. And I can show it calmly. There's no reason for me to get upset in front of that jury. I don't want to make those people upset. Now, after it's over, don't bring me back in there for the reading of the verdict. [But] I'm not going to act out [during my testimony].

*The Court:* I don't hear anything that changes my mind. I, you know, I ...

*Douglas:* Because you don't care. You don't want to see me win this case. My—everything points towards her [*i.e.*, K.I.] as a liar.

*The Court:* Well, let me observe [that] I don't care how the case comes out. It makes no, ... it's nothing to me one way or the other. [But] I can't bring Mr. Douglas in here.

*Defense Counsel:* I'm not asking you to.

*The Court:* I know what's going to happen if ... he starts off like this and I try to interrupt him. He won't be interrupted. And if I do interrupt him, ... we're going to hear [more of] what we've been hearing regularly when I do interrupt him—which is ... cursing and carrying on.

And ... if Mr. Douglas were permitted to ... make his speech, the State would have a right, then, to cross-examine Mr. Douglas. I am satisfied ... that he would not answer [the prosecutor's] questions except with invective and insults. [And] I would be presented ... with the [potential problem] of striking his testimony because he refused to submit to cross-examination. Because I am quite confident that he will not answer [the prosecutor's] questions, at least not in [any] ordinary sense, and I'd probably wind up having to strike his testimony[.]

I think the whole thing would just be pointless, and [would] leave the jury hopelessly prejudiced against him.

Because Douglas refused to testify unless he was physically present in the courtroom, the case was submitted to the jury without his testimony.

*Douglas's argument that he should have been allowed to present his testimony in the courtroom*

■ Douglas concedes that his behavior gave Judge Thompson good reason to exclude him from the courtroom for much of the trial. However, Douglas argues that Judge Thompson was obliged to give him another chance to come to the courtroom after Douglas promised not to "act out" in front of the jury when he delivered his testimony.

We are not sure that this claim of error was preserved in the trial proceedings.

As can be seen in the last-quoted transcript excerpt, after Douglas presented his request to testify while physically present in the courtroom, his next remarks were another lengthy accusation of perjury, corruption, and attorney incompetence. Hearing this, Judge Thompson declared that "[he could]n't bring Mr. Douglas in here"—to which Douglas's attorney responded, "I'm not asking you to."

In other words, the defense attorney appeared to acknowledge that Judge Thompson's position was justified, and that Douglas should not be brought into court to give his testimony.

Nevertheless, because of the importance of this issue to future cases, we will explain why we, too, conclude that Judge Thompson's action was justified.

In *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), the Supreme Court stated that even after a defendant has lost the right to be present at trial (by persisting in disruptive behavior), "the right to be present can ... be reclaimed as soon as the defendant is willing to conduct himself [with the requisite] decorum and respect". *Id.,* 397 U.S. at 343, 90 S.Ct. at 1061. In other words, even when defendants act disruptively and (because of this) are removed from their trial, they do not irretrievably forfeit their right to attend future court proceedings.

Frequently, defendants will (like Douglas) assert their innocence and, at the same time, their distrust of their attorneys, or the prosecutor, or the court, or all three. Some defendants are so disruptive and disrespectful when making these assertions that the defendants must be admonished or warned of potential consequences. And a few of these defendants—again, like Douglas—will be so persistent in this behavior that a judge must impose consequences if the judicial proceedings are to proceed in a fair and orderly fashion.

Nevertheless, it would be error to indefinitely bar a defendant from attending their trial or sentencing proceedings based merely

upon their past misconduct and the surmise that the disruptive conduct may continue. Such an approach would violate the mandate of *Illinois v. Allen,* which states that defendants must be allowed to reclaim the right to attend their trial by altering their behavior. As the Ohio Court of Appeals has observed,

> Virtually any defendant who is difficult to deal with could be barred from the courtroom [if the law only required proof that] he "might" act up in front of the jury, or [that] the trial judge "doesn't trust him" [to behave]. Such [an] expansion of the rule [in *Allen* ] would emasculate the Confrontation Clause.

*State v. Brown* (unpublished), 2004 WL 1445104 at *11 (Ohio App.2004).

We also note that the American Bar Association, in its standards relating to the function of a trial judge, recommends that when a defendant has been removed from the courtroom because of disruptive behavior, "there [should] be a standing opportunity for the defendant to return to the courtroom", and that the trial judge should "periodically ... offer [the defendant] an opportunity to return to the courtroom, conditioned upon good behavior." *ABA Standards for Criminal Justice,* "Special Functions of the Trial Judge" (3rd ed.2000), § 6–3.8, Commentary, p. 66.[2]

However, *Allen* does not say that a defendant automatically reclaims the right to be present whenever the defendant *promises* to behave. Rather, *Allen* says that the defendant reclaims the right to be present when the defendant "is willing" to behave.

█ We interpret this language to mean that a trial judge is not obliged to uncritically accept all promises of future good behavior. If the record affirmatively demonstrates good reasons for not accepting the defendant's promise at face value, the judge does not need to keep giving a disruptive defendant the benefit of the doubt.

As the Tenth Circuit observed in *United States v. Núñez,* 877 F.2d 1475 (10th Cir. 1989),

> [We do not read *Allen* ] to mean that when [a defendant is] excluded [from] his trial, he should ... thereafter [be] brought back at least once a day to ascertain whether he [will] promise to behave properly and if he [does] so promise, he should then [be] allowed to stay in the courtroom unless, and until, his next outbreak, *ad infinitum. Allen* contains no such requirement.

*Núñez,* 877 F.2d at 1477–78.

For instance, in *United States v. Ives,* 504 F.2d 935 (9th Cir.1974),[3] the defendant was removed from the courtroom on several occasions, based on disruptive behavior such as refusing to answer questions, arguing with the judge, striking the defense attorney, shouting from his cell beneath the courtroom, and physically attacking the prosecuting attorneys. *Id.* at 943–44.

Soon after Ives's attack on the prosecuting attorneys, his defense attorney requested that Ives be allowed to return to the courtroom so that he could testify. The trial judge ruled that Ives would not to be allowed into the courtroom again—and the judge did not offer the alternative of telephonic testimony. In other words, the trial judge declared that Ives had lost his right to testify. *Id.* at 944. The judge explained his decision:

> *The Court:* I don't think I have to sit back here and keep my fingers crossed about [the defendant's behavior], having him [come] up here [to the courtroom], and then [being sent] downstairs, and then back up here again.... [King] Solomon might have been able to determine what [the defendant] was going to do when he got here, but how far do I have to go? ... I am willing to go a long way, but I am not going to go overboard and have him back up here and have a reoccurrence of what has happened already on two occasions in this trial, and once in the prior trial, as to

---

2. The full text of this standard and its accompanying commentary are available at: *www.abanet. org/crimjust/standards/specialfunctions.pdf*

3. Vacated in part (on grounds not relevant here), 421 U.S. 944, 95 S.Ct. 1671, 44 L.Ed.2d 97 (1975). *See* the Ninth Circuit's decision on remand: 547 F.2d 1100 (9th Cir.1977).

his efforts to attack people in the courtroom. I am not obliged to do that.

*Ives,* 504 F.2d at 944–45.

As the Ninth Circuit observed, the defendant's request (to return to the courtroom to testify) posed a dilemma to the trial judge:

> If [the trial judge] refused to allow Ives to testify, [Ives's defense] counsel would charge that the court erred by denying [Ives] that privilege; [but] if [the trial judge] allowed Ives to testify and Ives acted as the judge believed he would, [Ives's defense] counsel would charge that the court erred by not granting a mistrial.

*Ives,* 504 F.2d at 945. Based on Ives's repeated disruptive and assaultive behavior, the Ninth Circuit concluded that "[i]t was not error for the trial court to refuse to allow Ives to testify in this case." *Id.* at 946.

In the present case, we need not reach the issue of whether Douglas's behavior might have justified Judge Thompson in completely depriving Douglas of his right to testify. Rather, the issue is whether Judge Thompson could properly require Douglas to present his testimony by telephone.

As can be seen from the lengthy transcript excerpts quoted above, Douglas was fixated on proving his innocence of the already-tried sexual assault charges. He insisted that he had been convicted of those charges due to his girlfriend's perjury, the State's suppression of evidence, and his own attorney's incompetence (or even connivance).

Moreover, Douglas repeatedly expressed his disdain and contempt for anyone who disagreed with him, or anyone who attempted to interfere with his protestations of innocence and accusations of perjury, misconduct, and incompetence.

Just as significantly, Douglas repeatedly and lengthily expressed these beliefs and attitudes whenever he chose, even when he was expressly admonished that he should remain quiet, or that his remarks were not pertinent to the issue being discussed. As Judge Thompson observed, "[Douglas] has to do all the talking, and nobody else can get a word in edgewise."

On several occasions, when Judge Thompson or Douglas's own attorney admonished

him to keep quiet and stop giving speeches, Douglas replied that he *could not* do so. For instance, at the March 2nd pre-trial hearing, Douglas aimed invective at the prosecutor. When Judge Thompson told Douglas to stop, Douglas replied that it was impossible—and he then accused the prosecutor of subverting justice:

> *The Court:* Mr. Douglas, you're going to have to control yourself.
>
> *Douglas:* I can't. This guy stole my evidence. He ...
>
> *The Court:* Well, we're not going to get into all ...
>
> *Douglas:* He tampered with my witnesses.

A similar colloquy—*i.e.,* another protestation by Douglas that it was impossible for him to remain silent—took place at the motion hearing on June 14th:

> *Defense Counsel:* Listen, you (indiscernible—simultaneous speech).
>
> *Douglas:* Excuse me. I can't take this. He [*i.e.,* the prosecutor] is a liar.
>
> *Defense Counsel:* You need to just sit and keep quiet.
>
> *The Court:* Try to take ...
>
> *Douglas:* Pig-eyed liar. He's going to hell.... [To the prosecutor] You're going to be swimming with [K.I.] in the lake of fire, you fucking fat pig. That's what I meant by going swimming, you pig-faced bastard.
>
> *The Court:* Well. Let me note that ... one reason I had Mr. Douglas brought [to the courthouse] today, instead of doing this by phone, was just to see if there had been any ...
>
> *Douglas:* Well, I just can't sit here and listen to lies, Your Honor.

We also note that, at the close of this same June 14th hearing, Douglas's attorney (Carey) rejected Douglas's demands that he voluntarily leave the case, and Judge Thompson then refused Douglas's demand that the judge remove Carey from the case. At the next opportunity—*i.e.,* when Carey went to visit Douglas at the jail that evening to confer about the trial—Douglas assaulted Carey.

For these reasons, we conclude that Judge Thompson could justifiably refuse to credit Douglas's promise of good behavior. It is possible that Douglas's promise would have been sufficient to warrant his return to the courtroom if the sole danger to the orderliness of the proceedings had been Douglas's history of physically assaultive conduct. If that had been the case, it is conceivable that precautions could have been taken to eliminate the possibility of assault while still allowing Douglas to present his testimony in person. But we need not resolve that issue—because, here, the record shows that Judge Thompson was not so much worried by the danger that Douglas would assault someone as by the danger that Douglas would, by his verbal conduct, undermine the orderliness of the trial and create the necessity for a mistrial.

When Douglas made his request to return to the courtroom for his testimony, he stated that he could not remain silent in the face of the purported perjury that was being presented against him. Douglas declared, "[My accusers] are lying. [And that] is what I have to do [when I testify]. If my lawyers will not show the proof [of my innocence], I have to show it."

It is true that Douglas also declared that he could present this proof "calmly". But, based on Douglas's persistent behavior on past occasions, Judge Thompson did not believe that Douglas was capable of controlling himself:

> *The Court:* I know what's going to happen if . . . he starts [proclaiming his innocence and asserting the corruption and incompetence of everyone else,] and I try to interrupt him. He won't be interrupted. And if I do interrupt him, . . . we're going to hear [more of] what we've been hearing regularly when I do interrupt him—which is . . . cursing and carrying on.
>
> [I]f Mr. Douglas were permitted to . . . make his speech, the State would have a right, then, to cross-examine Mr. Douglas. I am satisfied . . . that [Douglas] would not answer [the prosecutor's] questions except with invective and insults. [And] I would be presented . . . with the [potential problem] of striking his testimony because he

refused to submit to cross-examination. Because I am quite confident that he will not answer [the prosecutor's] questions, at least not in [any] ordinary sense, and I'd probably wind up having to strike his testimony[.]

In other words, just like the trial judge in *Ives* (discussed above), Judge Thompson faced the dilemma that if he refused to allow Douglas to return to the courtroom to testify, Douglas would claim that his constitutional rights had been infringed, but if the judge allowed Douglas to return, there was every reason to believe that Douglas would engage in behavior that would require the judge to declare a mistrial—or, at least, would require the judge to order Douglas's removal from the courtroom (in front of the jurors).

Given the record in this case, we do not believe that Judge Thompson was working from mere surmise when he concluded that Douglas would engage in renewed disruptive conduct if he was allowed to return to the courtroom. As we noted above, even Douglas's own attorney was apparently convinced that there was little chance that Douglas would behave himself if (as would almost inevitably happen) he was cross-examined in a way that made him uncomfortable, or if he was admonished by the judge to confine his remarks to pertinent subjects and admissible evidence.

For these reasons, we uphold Judge Thompson's decision not to allow Douglas to return to the courtroom to present his testimony.

*Judge Thompson's decision to allow the State to introduce evidence that Douglas had been convicted of the underlying sexual assaults*

■ As explained above, at the pre-trial hearing of June 14, 2004, Douglas's attorney announced that Douglas's defense to the witness tampering charges would be the assertion that Douglas was actually innocent of the underlying sexual assaults—so that when he urged his girlfriend to testify that he was innocent, he was simply urging her to tell the truth.

The defense attorney's opening statement to the jury at Douglas's trial conformed to

this strategy. The defense attorney conceded that Douglas had physically assaulted his girlfriend, and that "she suffered some bad injuries" as a result of those assaults. Nevertheless, the defense attorney asserted, "there was no sex"; that is, Douglas did not sexually assault K.I. Thus, when Douglas spoke to K.I. by telephone and declared that there had been no sexual assault, he was not asking or suggesting that K.I. "testify falsely, [or] offer misleading testimony, or withhold testimony".

Later in the trial, during his cross-examination of K.I., the defense attorney elicited the fact that a post-assault medical examination failed to find sperm in K.I.'s body. In addition, the defense attorney elicited the fact that K.I. was extremely intoxicated when she was brought to the hospital. (Apparently, K.I. had a blood alcohol content of .295 percent at that time.) Also, the defense attorney got K.I. to acknowledge that she had later sent a letter to the District Attorney, claiming that no rape had occurred and that she had inflicted the injuries on herself.

In response, the prosecutor began his redirect examination of K.I. by referring to the fact that K.I. had been cross-examined in similar ways at Douglas's earlier trial for sexual assault, and that Douglas had been convicted at that earlier trial. This prompted the defense attorney to object and request a mistrial—which Judge Thompson denied:

*Prosecutor:* [K.I.], there was another trial in this case, wasn't there?

*K.I.:* Yes, there was.

*Prosecutor:* . . . And you testified in that trial, right?

*K.I.:* Yes, I did.

. . .

*Prosecutor:* Were you subject to cross-examination [in that other trial], like you're subject to cross-examination now? . . . [Q]uestions about your drinking? . . . [Q]uestions about psychiatric care that you'd received, and whether or not you were taking any medications at the time?

*K.I.:* Yes.

*Prosecutor:* The jury [in the other trial] heard your answers to all those questions, right?

*K.I.:* Yes.

*Prosecutor:* [And] Mr. Douglas was convicted of rape in . . .

*Defense Counsel:* I object, Your Honor. That door has not been opened at all. In fact, I move for a mistrial . . . based on the introduction of that [fact].

*The Court:* I'll overrule the objection, and deny [the] request for a mistrial. I think that [your] cross-examination did effectively raise the issue [of whether a sexual assault actually occurred]. And, [as] I believe I indicated . . . earlier, [the prosecutor] could, in fact, bring up the previous conviction [if the defense denied that a sexual assault occurred].

. . .

*Prosecutor:* [to K.I.] So you've done this before, in front of another jury, and he was convicted, right?

*K.I.:* Correct.

On appeal, Douglas challenges Judge Thompson's ruling on two grounds.

First, Douglas argues that the challenged testimony was "irrelevant . . . [because the] defense had presented no evidence that the underlying sex[ual] assault had not occurred" and, thus, the defense "did not open the door to evidence of [Douglas's sexual assault] conviction." As demonstrated by the content of the defense attorney's opening statement and the defense attorney's cross-examination of K.I., this contention is simply wrong (as a factual matter).

Second, Douglas argues in the alternative that, even if the challenged testimony was relevant, it nevertheless constituted evidence of another crime committed by Douglas, and it should have been excluded under Alaska Evidence Rules 404(b) and 403 because its probative value was outweighed by its potential for unfair prejudice.

There are two answers to this contention.

First, the defense attorney never asked Judge Thompson to consider the issue of probative value versus potential for unfair prejudice. The defense attorney argued only that the challenged evidence was strictly inadmissible—because (according to the defense attorney) the defense had never opened

the door to this evidence by asserting that no sexual assault ever occurred.

Second, even though this challenged evidence tended to show that Douglas had sexually assaulted K.I., the jurors were already well aware of this allegation, and they had heard much of the evidence supporting it. The whole basis of the witness tampering charge was that Douglas had sexually assaulted K.I. and then later, in a series of telephone calls from the jail, he asked or encouraged K.I. to lie about this matter and say that no sexual assault had occurred. During her testimony at the witness tampering trial, K.I. repeatedly asserted that Douglas had, in fact, sexually assaulted her.

For these reasons, neither of the arguments raised in Douglas's brief has any merit.

The real problem with this evidence, as Judge Thompson noted at the pre-trial hearing of June 14th,[4] is that evidence of a criminal conviction is inadmissible hearsay under Alaska law if it is offered to prove that the defendant actually engaged in the conduct that would justify that conviction. *See Spenard Action Committee v. Lot 3, Block 1, Evergreen Subdivision*, 902 P.2d 766, 780 (Alaska 1995) (holding that "the Alaska Rules of Evidence articulate a policy against admitting criminal judgments as evidence [of the underlying conduct]"); *F.T. v. State*, 862 P.2d 857, 863–64 (Alaska 1993) (holding that "the trial court erred in taking judicial notice of [domestic] restraining orders [issued against a child's father] for the purpose of establishing that [the father] had committed acts of violence in the past.").

That being said, there was no plain error in admitting this evidence.

■ First, hearsay that would be objectionable is nevertheless admissible if no hearsay objection is raised.[5]

■ Second, it is arguable that the doctrine of collateral estoppel barred Douglas from asserting that he was innocent of the sexual assaults for which he had previously been convicted.

The Alaska Supreme Court has held that defendants who plead guilty or no contest to a felony, or who are tried and found guilty, are thereafter estopped from contesting their factual guilt of the essential elements of that crime in a later civil proceeding. This is true whether the defendant is appearing in that civil litigation as a plaintiff[6] or as a defendant.[7]

The supreme court has not yet had occasion to decide whether this same doctrine of estoppel applies to situations like the one presented in Douglas's case—situations where a defendant is convicted of a felony following a trial, and then the State pursues related criminal proceedings against that same defendant.

However, these situations would seemingly satisfy the four requirements of the doctrine of collateral estoppel: (1) the plea of collateral estoppel is being asserted against a party to the previous litigation; (2) the factual issue to be precluded from re-litigation is identical to a factual issue decided in the previous litigation; (3) this factual issue was resolved by a final judgement on the merits in the previous litigation; and (4) the resolution of this factual issue was essential to the final judgement in the previous litigation. *See Snook v. Bowers*, 12 P.3d 771, 777 (Alaska 2000).

In *Hess v. State*, 20 P.3d 1121, 1126 (Alaska 2001), the Alaska Supreme Court noted

---

**4.** At the June 14th hearing, Judge Thompson explained that Douglas's sexual assault conviction, offered for the purpose of proving his factual guilt of the underlying sexual assault, "is technically a hearsay finding by [twelve] people who [won't be] present [at the witness tampering trial]. The twelve jurors who found him guilty [of sexual assault] aren't here."

**5.** *See Rusenstrom v. Rusenstrom*, 981 P.2d 558, 560 (Alaska 1999); *Bird v. Starkey*, 914 P.2d 1246, 1248 n. 1 (Alaska 1996); *Byrd v. State*, 626 P.2d 1057, 1058 (Alaska 1980); *Cassell v. State*,

645 P.2d 219, 220–21 (Alaska App.1982); *see also* John W. Strong, *McCormick on Evidence* (4th ed.1992), § 55, Vol. 1, p. 221 (failure to object to hearsay is a waiver of the objection).

**6.** *See Howarth v. Alaska Public Defender Agency*, 925 P.2d 1330, 1332–33 (Alaska 1996).

**7.** *See Lamb v. Anderson*, 147 P.3d 736, 742 (Alaska 2006); *Wyatt v. Wyatt*, 65 P.3d 825, 831 (Alaska 2003).

that the Commentary to Alaska Evidence Rule 803 suggests that collateral estoppel may apply to these situations. The final paragraph of that Commentary reads:

> *Note on Omission*—Omitted from this rule is an exception for [previous] judgments of ... conviction. *See* Federal [Evidence] Rule 803(22).... [T]he only reason to include an exception for [previous] judgments of ... conviction is to permit [the] finding of one trier of fact to come before another [trier of fact]. *If a judgment of guilt [ ] in a criminal case, which follows proof beyond a reasonable doubt, is to have [an] impact in subsequent cases, the impact should be by way of collateral estoppel, not admitting the previous judgment.*

(Emphasis added)

One could argue that Douglas's convictions for sexual assault were not yet final, in the sense that he still had the right to appeal those convictions. But in *Wyatt v. Wyatt*, 65 P.3d 825, 831 (Alaska 2003), the supreme court noted that Alaska law generally gives preclusive effect to trial court judgements even when there is still a possibility that the judgement will be overturned on direct appeal.

We need not resolve any of these issues in Douglas's case. We need only point out that there is at least a plausible legal argument that Douglas should not have been allowed to assert his innocence of the underlying sexual assaults against K.I. when this factual issue was raised at Douglas's later witness tampering trial. This fact (that the issue of collateral estoppel is at least debatable) precludes any finding of plain error with regard to the admission of evidence that Douglas was convicted of those sexual assaults—because any error arising from the admission of this evidence would be harmless if, under the law, Douglas should not have been allowed to assert his innocence in the first place.

*Did Douglas's physical assault on his defense attorney on June 14th require the defense attorney to withdraw from further representation of Douglas?*

■ As explained above, serious disagreements surfaced at the pre-trial hearing on June 14, 2004 between Douglas and his attorney, William Carey. Toward the close of that hearing, Carey refused Douglas's demand that he remove himself from the case, and then Judge Thompson refused Douglas's demand that he (the judge) order Carey to withdraw from the case.

Later that day, Carey visited Douglas at the jail to confer with him about the trial (which, at that time, was scheduled to start the following day). During this visit, Douglas punched Carey in the face and had to be restrained by corrections officers.

When court reconvened the next day, Carey informed Judge Thompson what had happened. He told the judge that he had discussed this matter with the Bar Counsel (*i.e.*, the discipline counsel for the Alaska Bar Association), and that he did not wish to withdraw from Douglas's case. However, Carey asked Judge Thompson to order a psychiatric evaluation of Douglas. (This led to a delay of Douglas's trial until late August.)

During that same court proceeding of June 15th, the prosecutor announced that he intended to charge Douglas with assault, based on Douglas's act of punching Carey.[8]

The prosecutor acknowledged that Carey, "for admirable reasons", was not being a "cooperative victim". The prosecutor declared, however, that the assault charge could be prosecuted without any significant cooperation from Carey, since the assault had occurred in the presence of corrections officers.

The prosecutor then suggested that the State's decision to charge Douglas with this crime "place[d] Carey ... in a position that will make it difficult for Carey to continue [to represent Douglas]". Carey responded:

> *Defense Counsel:* Your Honor, I want to make it clear [that] I'm not moving to

---

**8.** According to the Alaska Court System's on-line records database, a formal charge of fourth-degree assault, AS 11.41.230(a), was filed against Douglas three weeks later (on July 7, 2004). *See* *State v. Douglas*, File No. 1KE-04-687 Cr. Douglas ultimately pleaded guilty to this misdemeanor charge on October 4, 2004.

withdraw. I didn't ask for this to happen last night. It's obviously disturbing. But I think it goes more to the competency of this defendant. It may be that [he has a] mental defect that can be controlled by medication or otherwise.... Right now, ... [in] my mind ... and under the [pertinent] case law, deference [should] be given to [the] defense counsel who knows the guy, who spends time with the guy.

. . .

I'm not afraid of him. [I concede that], as far as actually getting anything done, being able to rationally discuss matters affecting [his] case, I don't think that's going to be possible right now. [But] I don't think that it's a matter of just myself. I think it's a matter of Mr. Douglas and whatever demons he's dealing with.

When the parties re-assembled in court two months later (August 20th), it was revealed that the State had obtained a "no contact" order from a district court judge in the assault case, an order that barred Douglas from having any contact with the alleged victim of the assault—*i.e.*, his attorney, Carey.

Carey told Judge Thompson that he knew nothing about this no-contact order, and he also told Judge Thompson that the order should be vacated. Judge Thompson indicated his agreement: "Mr. Carey can't proceed very effectively if he can't have contact with his client." At this point, Douglas spoke up and said that he personally wanted the no-contact order left in place—so that Carey would be effectively removed from the case.

However, Douglas did not argue that Carey had a conflict of interest because of the assault. Rather, Douglas asserted that Carey was "intimidating" him—by trying to convince him to accept a plea bargain in the witness tampering case, even though the evidence showed that Douglas was completely innocent of all wrongdoing:

*Douglas:* I don't want [the no-contact order] dropped. I want—he's the one that—he's the one that is intimidating me. He's telling me that I'm wrong, [that] I should take this deal.... Right here, it says in [this] letter, "I want [to] state once again that I think you're being exceedingly foolish by not accepting the offer that the district attorney has extended, which would give you no additional jail time [and] only one class C felony conviction."

That's one class C felony conviction too many. I shouldn't have *any* convictions concerning this woman.... She's a liar.

. . .

I have a no-contact order with this man that's defending me right now—supposedly—and I want to keep that no-contact order. And I don't even—I shouldn't even be talking with this man, or letting him hear me talk. We're breaking the law right now. I do not want him to represent me. He does not have my best interest at heart. I want away from this man.... I trusted this Kristen Swanson [*i.e.*, the attorney who represented Douglas at his earlier sexual assault trial] to take care of this business, and she never did. And this is going to—she's going to lose her bar license over this. She had all of this [exculpatory] evidence before her, and she didn't use any of it.

. . .

There's no way that we can carry on with Bill Carey. I mean, there's no way.... I've got [his] letters right here that prove—and if we do carry on, we'll just be doing this [all over again after the] appeal—because he shouldn't be representing me after some of the letters, and [the] comments he made in these letters, that, I'm basically, guilty. He's saying that I'm guilty, and [that] I'm a fool for not taking the deal the prosecutor [is offering], ... and that's not his place to do that. I am innocent. I'm an innocent man, and ... hopefully the [appeal] process will prove it. But he's trying to force me into—by intimidating me and telling me [that] he's not scared of me, and that I'm foolish and I'm crazy. I've gotten it all in writing. So you might as well just get him off the case, and get me a[new] lawyer that's going to at least try this case for me, you know.

The no-contact order is not mentioned again in the transcript, so it was apparently vacated (or at least ignored by all sides).

However, when the parties returned to court on August 27th (after API reported that Douglas was competent to stand trial), the prosecutor again raised the issue of Carey's continued representation of Douglas:

*Prosecutor:* The State believes that there is a conflict [of interest between Mr. Carey and Mr. Douglas] because of the pending assault [charge], and that that conflict has to be waived in writing [before we can proceed with Douglas's trial].

. . .

*The Court:* I understand your point of view. [But] I don't think it's correct. You know, [there have been] a number of times in the past where defense counsel were actually afraid of their clients, but we managed to [proceed]. Otherwise, you would place a premium on . . .

*Douglas:* Hey, I'm afraid of this lawyer. . . . He's got animosity towards me, Your Honor. . . . There's no way this guy can represent me. I'm going to appeal everything, and I'll win. . . . I've got a report from an officer that saw him square off at me first. . . . It's in a Department of Corrections [report]. They saw it; they witnessed it. The guy said, "Mr. Carey squared off against Mr. Douglas." . . . When you square off against somebody that's been penned up with seven men in one little cell illegally for a year, . . . you're going to get your face punched.

. . .

*Defense Counsel:* Your Honor, . . . with respect to my representation of Mr. Douglas, I intend to continue. I have consulted with Bar Counsel . . .

*Douglas:* You're an idiot too, pal.

*Defense Counsel:* I have consulted . . .

*Douglas:* Get off my case.

*Defense Counsel:* I have consulted with a number of . . .

*Douglas:* I'm going to sue you for everything you've got.

*Defense Counsel:* You can do that, sir.

*Douglas:* I'm going to sue you for everything you've got.

*Defense Counsel:* But I'm prepared to go ahead.

. . .

*Douglas:* I have a problem with this attorney. He hasn't researched my case. He hasn't even looked at the—he doesn't even know what the thing's about. He's basically saying that I'm guilty [based on] what he's heard, and that's not true. He's a liar, and he's—and he's told me that. . . . He's told me to take the deal. . . . You heard [the prosecutor]. [The prosecutor] said that there's a conflict here.

From Judge Thompson's ensuing colloquy with Douglas, it appears that the judge did not believe that Douglas's dispute with Carey arose from the assault. Rather, Judge Thompson concluded that Douglas's dispute with Carey was the same type of dispute that Douglas had had with all of his preceding attorneys: Douglas had his own litigation agenda, Douglas would not listen to any attorney who did not share this agenda, and Douglas believed that any attorney who could not be persuaded to adopt his view of matters was either incompetent or was consciously trying to have Douglas convicted.

In other words, Judge Thompson concluded that it would do no good to appoint another attorney, for Douglas's relationship with any new attorney would ultimately be no better than Douglas's relationship with Carey. Accordingly, Judge Thompson ruled that Carey could remain as Douglas's attorney.

On appeal, Douglas challenges Judge Thompson's ruling on two grounds.

First, Douglas argues that Judge Thompson should have dismissed Carey as Douglas's attorney because Douglas's relationship with Carey had broken down to the point where they could no longer discuss the case in any meaningful way.

In our prior cases on this subject, we have declared that personal difficulties or animosity between a defense attorney and a defendant will constitute a reason for removing the defense attorney if "the attorney-client relationship has deteriorated to the point where the attorney is incapable of effective communication with the defendant or the attorney is incapable of objective decision-making about

the case". *LaBrake v. State*, 152 P.3d 474, 482–83 (Alaska App.2007).[9]

■ However, a defendant may not purposely frustrate the defense attorney's efforts and then claim that the attorney-client relationship has become non-functional because of the defendant's own lack of cooperation.[10]

For instance, in *Sergie v. State*, 105 P.3d 1150 (Alaska App.2005), the defendant claimed that he and his attorney were no longer communicating in any meaningful fashion. However, the record showed that Sergie was "constantly angry", was "rude and abusive" during his telephone conversations with the attorney, and refused to speak to the attorney when the attorney visited Sergie in jail. Even though the attorney himself declared that his relationship with Sergie was "damaged beyond repair", the trial judge refused to allow the attorney to withdraw—and we upheld the trial judge's decision. We declared that the trial judge "was not required to appoint new counsel for Sergie merely because Sergie refused to cooperate with the counsel he already had." *Sergie*, 105 P.3d at 1157.

See also *Annas v. State*, 726 P.2d 552, 558–59 (Alaska App.1986), where this Court held that a defendant's refusal to cooperate with his court-appointed attorney, and the defendant's demand that the attorney withdraw from his case, did not constitute good cause for the defendant's untimely filing of pre-trial motions, nor did these considerations constitute good cause for a continuance of the defendant's trial.

In Douglas's case, Carey stated that his inability to communicate with Douglas about the case was not due to any animosity on Carey's part arising from the assault. Rather, their lack of meaningful communication was due to Douglas's inability to focus on the issues that needed to be discussed:

*Defense Counsel:* [A]s far as actually getting anything done, being able to rationally discuss matters affecting [Douglas's] case, I don't think that's going to be possible right now. [But] I don't think that it's a matter of just myself. I think it's a matter of Mr. Douglas and whatever demons he's dealing with.

Judge Thompson ultimately agreed with Carey's assessment, and the record amply supports the judge's conclusion.

Douglas also argues that whenever a defendant assaults their defense attorney, the attorney must be disqualified—because now the attorney's personal interests are irretrievably in conflict with the interests of the defendant. *See* Alaska Professional Conduct Rule 1.7(b).

But the record gives no indication that Douglas's assault engendered such powerful anger or animosity in Carey that he was no longer capable of objective and loyal decision-making on Douglas's behalf. To the contrary: The record shows that Carey did not abandon his efforts on Douglas's behalf following the assault, nor did Carey view the assault as a personal affront. Rather, Carey viewed the assault as an indication that Douglas might be mentally troubled.

As the prosecuting attorney remarked, Carey did not support or cooperate with the State's efforts to prosecute Douglas for this assault. Instead, Carey argued (successfully) to Judge Thompson that the assault was evidence of Douglas's potential mental problems, and that the witness tampering trial should be postponed so that Douglas might be evaluated at API.

We note that Carey took the step of consulting the state Bar Counsel about this matter, and the Bar Counsel apparently concurred that Carey was not required to withdraw from further representation of Douglas.

---

**9.** Citing *Walsh v. State*, 134 P.3d 366, 371 (Alaska App.2006); *Mute v. State*, 954 P.2d 1384, 1385–86 (Alaska App.1998); *Gardner v. State*, Alaska App. Memorandum Opinion and Judgment No. 5064 at 9–11 (March 29, 2006), 2006 WL 829758 at *4–6 (Mannheimer, J., concurring); Wayne R. LaFave, Jerold H. Israel, and

Nancy J. King, *Criminal Procedure* (2nd ed.1999), § 11.4(b), Vol. 3, p. 554.

**10.** *See Coleman v. State*, 621 P.2d 869, 881 (Alaska 1980).

We further note that, on appeal, Douglas does not argue that Carey's presentation of his case was deficient or even questionable in any way. Douglas does not point to a single instance where Carey's conduct might have been influenced by overriding animosity toward Douglas. Instead, Douglas offers only the general assertion that whenever an attorney has been assaulted by a client, the attorney must be disqualified from further representation of that client.

We do not agree that a client's assault upon an attorney invariably requires the attorney's disqualification from further participation in the case. Moreover, we conclude that Douglas's case provides an example of a situation where disqualification was not required.

*Conclusion*

The judgement of the superior court is AFFIRMED.